## STATE OF IOWA v. JOHN HUDSON, Appellant

**Homicide: EVIDENCE.** In a prosecution for homicide testimony is admissible of an eye witness, although he did not arrive at the place of shooting until after others reached there.

**PRESUMPTION OF SELF DEFENSE.** The presumption of self defense is rebutted by evidence that defendant and deceased had been quarrelling; that deceased afterwards went upon a railroad embankment and bantered defendant to come up if he wanted a fight; and that defendant went up on the embankment, and when about thirty-five feet from the deceased, who was unarmed, fired the fatal shot.

**FALSE DENIALS.** In a prosecution for homicide, evidence is admissible of the denial of the accused, shortly after attempting to avoid arrest, that he had been at the place where the shooting occurred within three months, though there was no dispute but that accused was there at the time of the shooting.

**RE-DIRECT EXAMINATION:** *Part of conversation.* Under Code, section 4615, providing that when part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be enquired into by the other, it is competent, on re-direct examination, to ask for additional parts of a conversation, and relating to the same subject, that has been brought out on cross examination.

**Competency of Juror:** *Bias.* A juror who testifies that he has formed a fixed opinion of defendant's innocence or guilt, which it would take evidence to remove, but who thinks he can render a verdict upon the testimony introduced, is competent.

**Using all Witnesses before Grand Jury.** In a prosecution for homicide the state is not bound to put on the stand all the witnesses who were examined by the grand jury, even though the witnesses called testified to only a part of the occurrence.

**Misconduct in Argument.** The fact that the county attorney, in his closing argument in a prosecution for homicide, characterizes certain witnesses as tramps, is not error, where such characterization is reasonably justified.

*Appeal from Clinton District Court.*—HON. P. B. WOLFE, Judge.

TUESDAY, OCTOBER 3, 1899.

THE defendant was indicted for murder in the first degree, in killing one Patrick Murphy by shooting him on October 24, 1898. He pleaded not guilty, and, upon trial had, was found guilty of manslaughter, and judgment of imprisonment in the penitentiary for the term of eight years rendered against him, from which judgment he appeals.— *Affirmed.*

*Walter I. Hayes* for appellant.

*Milton Remley, Attorney · General. C. H. George,* *County Attorney,* and *W. · H. Redman* for the State.

GIVEN, J.—I. One Ben Van Epps, being called as a juror, on examination as to his qualifications, said, in substance, as follows: That he knew the case only as he read and heard of it; heard men from the place where the transaction took place talking as if they were talking facts, and from this, and what he read, he had formed an opinion—a fixed opinion—as to the guilt or innocence of the defendant, that it would take evidence to remove. He further said, "I do not know whether the reports are true," and made answers as follows: "Q. But you think, notwithstanding anything you may have heard or read, you could try the case upon the testimony introduced before the jury, and render a verdict upon that? A. Yes, sir. Q. Now, in hearing the evidence or in determining this matter, would this opinion you have formed, and which you have stated, affect your arriving at a verdict, or affect you in your consideration of the evidence, at all? A. Well, I don't know as it would. Q. You don't know whether it would or not? A. No, sir." Appellant's challenge for cause was overruled, and of this he complains. As frequently occurs on such examinations, the answers were not entirely consistent. The matter to be determined was whether the juror had such an opinion as would prevent him from rendering a true verdict upon the evidence. It does not fol-

low that every one who says he has formed an opinion from what he has heard and read is disqualified. The appearance and intelligence, or want of intelligence, of a juror, as he appears before the court, may go far to convince the mind that he can or cannot rise above the opinion formed, and render a verdict upon the evidence alone. With the superior opportunities of trial courts in determining this fact, the presumption is in favor of the ruling; but in passing upon such challenge they should exercise great care to see that disqualified jurors are not permitted to sit, and to resolve all reasonable doubts in favor of the challenge. It is the duty of the court, not of the juror, to determine whether his opinion disqualifies him to act as a juror. *State v. Munchrath,.* .78 Iowa, 268; *State v. Brady,* 100 Iowa, 194; *State v. Foster,* 91 Iowa, 164; *State v. Young,* 104 Iowa, 734; *State v. Weems,* 96 Iowa, 426; *State v. Yetzer,* 97 Iowa, 423. While we are not disposed to extend the rules announced in. these cases, we adhere thereto, and reach the conclusion that,. under them and the facts in this case, appellant's challenge was properly overruled.

II.   Dr. Cook, who attended the deceased, was called by the state, and was asked on cross-examination: "Q. Did Mr. Murphy make any statement to you as to the shooting?" There being no objection, the witness answered: "A. Not as to who did it. He said he did n't know. He said he was under the influence of liquor. He said they were all drunk.'"

On redirect examination he was asked: "Q. Did he made any statement in regard to whether he had a revolver himself?" Appellant objected, "as not proper redirect examination," which objection was over-- ruled, and the witness answered: "A. He did." The witness was then asked: "What did he say?" to which appel- lant objected "as irrelevant, immaterial, hearsay, and not proper redirect examination, and as not referring to any- thing asked on cross-examination." The objection was over- ruled, and the witness answered: "A. He claimed he did!

not have one." Of these rulings appellant complains. The importance of this testimony will hereafter appear. There is but one theory upon which the state was entitled to ask these questions on re-direct-examination, and that is that they called for parts of the same conversation, and in relation to the same subject, that had been called out on the cross-examination. Appellant had asked for Murphy's statements as to the shooting, and immediately following, the state asked what he said as to having a revolver. This was calling for a part of the same conversation pertaining to the same subject, and was competent, under the provisions of section 4615 of the Code. We think it fairly appears that the questions asked by the state, and the answers given, related to the same conversation to which Dr. Cook testified on cross-examination. Louis Koch, who saw the transaction when about one hundred yards distant, and who went immediately to the place of the shooting, was asked: "Q. State whether the man Murphy—the man who was shot—had a revolver or an instrument for shooting?" Appellant's objection was overruled, and the witness answered: "I didn't see him have any revolver; not that I seen." It is argued that this was error, because others reached the place before the witness, and because he was not asked as to his means of knowledge, nor what he did to find out the fact. He had stated fully what he saw and heard when one hundred yards away, while on the way, and after he reached the place, thereby disclosing fully his means of knowledge. The fact that others were there a moment before him only goes to the weight of his testimony. Witness Morgan, who assisted in arresting the defendant on the day of the shooting, was permitted, over defendant's objections, to testify that defendant said he had not been in Wheatland (the place where the shooting occurred) that day, nor for three months. It is insisted that this was immaterial, and related to a matter about which there was no dispute. True, there was no room for dispute

.but that appellant was in Wheatland, and at the place of the ·shooting, at the time it occurred; but it was competent and material to show that he denied that fact, especially just -after attempting to escape to avoid arrest.    We discover no ·errors in the rulings of the court in taking evidence.

III.    After the prosecution rested, the defendant moved the court for a verdict on the following grounds: "First, that the state had not shown sufficient facts to warrant a conviction; second, that the state had not rebutted the presumption of self-defense, or that the defendant did not act in self-defense; and, third, because it appears that a quarrel was taking place,—that words were being used,—and it further ap₁ cars that there were a number of witnesses within a proper distance to hear .and know what was taking place, who have not been called by the state, which witnesses were called and sworn before the ·grand jury in this case, as appears by the record."    This motion was overruled, and of this the appellant complains. The state had called but three witnesses who testified to what took place at the time of the shooting, as observed by them ·at some distance from the place of the shooting.    Their testimony showed that the affair took place on the top of a railroad embankment, and that a number of men were close by, ·at the foot of the embankment, at the time.    The record shows that several of these men were examined before the grand jury, but were not called on the trial.    Whether the court erred in overruling this motion on the first and second grounds must be determined upon the state of the testimony before the court and jury at that time.    There can be no doubt that appellant shot Murphy, and inflicted a wound of which he afterwards died.    The real contention is that the state "had not rebutted the presumption of self-defense." Jack Izer, who resided at Marion, and was four hundred and twenty-five to four hundred and fifty feet distant, talking to two men, testified as follows: "One of the men said, 'I guess there is going to be a fight.'    I said 'No, they won't

fight;' and the man that got shot came up on the track. At this time Hudson was standing down the bank below the other man, and the man that got shot came up with his coat off, swinging it around, and said to Hudson, 'If you want to fight, come up on the track.' Hudson came up, and at that time I just turned my head to speak to these men standing there, when I heard the report of a revolver, and, whirling round, I saw the smoke, and saw Hudson put something in his pocket and start away. The smoke was between him and the man that was falling. I saw him fall. Hudson went east on the Northwestern track, then came back, came up the Milwaukee track to the north, went past the depot, and then turned west. He passed within seven or eight feet of me, and I recognize this defendant as that man. He did the shooting. I heard but one report of the revolver,—nothing more except an echo sounding over the flat. That is what I took it for. We were there probably ten or twenty minutes before the shooting took place. Murphy came up on the bank first. He had his coat off. I do not think Hudson was up on the bank over three minutes before the shot. At the time of the shooting, Hudson had his back towards me." He further stated that defendant was the man who did the shooting, and on cross-examination stated as follows: "I could see smoke between the two men. There were no other men up there but these two, and I saw Hudson put something in his pocket when he started away, and the reason I think he did the shooting is because I saw him put something in his pocket. There is no other reason. I did not see him shoot, and my face was the other way. The men were from four hundred and twenty-five to four hundred and fifty feet from me. They were on the south side of the crossing. Mr. Hudson was right west of Murphy. They were about twenty-five feet apart, making them four hundred and twenty-five feet, or so, from me. We stopped because we heard them quarreling,— heard angry expressions. Mr. Murphy said to Mr. Hudson, "Come up here on the bank, you son of a bitch, if

you want to fight." Louis Koch, who resided in Wheatland, testified as follows: "I saw the shooting. I saw the man fall. I was about one hundred yards from the crosing west. I was taking down the switch lights, and I saw two fellows step out on the side of the tráck,—on the east side of the Milwaukee track,—right at the crossing. They had a few words together, which I couldn't hear; but I saw them standing facing each other, and I seen the shooting, and the man that was standing towards the east, facing the west, done the shooting. The man standing towards the west was shot, and the man who done the shooting walked down the track east, afterwards came back and went north on the Milwaukee track, and that was all I saw of him. I went down and looked at the man that was shot. There were seven or eight others there. There were several that got there before I did." He further said, "There was only one shot fired," and that the man who did the shooting went north by the Milwaukee track. On cross-examination he stated that he was on the Northwestern track, and that they were east, and east of the Milwaukee track; that he could not hear what was said; that he saw them step out, facing each other; that the man who did the shooting was facing towards the west; and that Murphy's back was towards him. C. T. Frost, also a resident of Marion, Iowa, and an employe with Mr. Izer of the Milwaukee road, and engaged with him at work at the time, testifies as follows: "I saw the smoke of the shooting. Saw Mr. Murphy standing on the bank, first cursing and swearing and talking very wild. I turned to talk to some men there, and heard the report of a gun, and, looking around, saw Murphy falling. Saw Hudson standing there, and he turned and walked east, then turned and came back towards the Milwaukee depot. The defendant here is the man Hudson. I saw no one but Hudson and Murphy. I heard the report, and saw smoke between Hudson and Murphy. I saw Hudson put something in his pocket. I could see the tops of the heads of other men below

the bank. I should say, eight or ten. I first went up to the Milwaukee depot, and then came down to where the man was shot. I heard part of what was said there. Murphy, the man who was shot, was cursing somebody down there under the bank. I do not know whether you would call what he said threats or not. He was calling names and swearing. There was loud talking, but I could not distinguish all that was said. Only heard a part. Did not hear any threats to kill. What I did hear and distinguish was said by Murphy. I was with Mr. Izer, and was about forty feet from the place at the time." The only other evidence offered by the state was that of the surgeons, to the effect that the shot was the cause of death; and of the two men who made the arrest, as to what transpired at that time; also, the testimony of one witness who testified that deceased was intoxicated. It may be inferred from this testimony that the deceased and defendant were quarreling before deceased came up on the railroad track, but what the quarrel was about, or to what extent it had been carried, does not appear. It does appear, however, that Murphy came up on the grade and bantered Hudson to come up if he wanted to fight; that Hudson came up, and, when about twenty-five feet from the deceased, fired the shot that killed deceased. This evidence tends to show that deceased was unarmed; that all he did after coming away from Hudson and up onto the track was to swing his coat and banter Hudson to come if he wanted to fight. There is nothing whatever to indicate that Hudson was in any peril, but, on the contrary, that deceased was going away from him, and that all that Hudson had to do to avoid harm was to remain where he was, and decline the challenge to come up if he wanted to fight. It appears that, though in no peril whatever, Hudson came up and fired the shot that killed Murphy. This evidence not only tends to show that Murphy was unarmed and that Hudson was in no peril, but also that only one shot was fired and that by Hudson, and that it was the shot that

killed Murphy. Whatever may have transpired before Murphy came upon the track, it is quite clear from this evidence that from that time forward the defendant had had no peril to defend against. It is true, these witnesses knew nothing of what had transpired prior to Murphy's coming upon the track, nor could they distinguish what was said in the quarel after he came there, except his banter to Hudson to come up if he wanted to fight. Appellant concedes that the state need not call or account for all the witnesses examined before the grand jury, but insists that this rule does not apply where the witnesses called testified to only a part of the transaction, where it is shown that there are witnesses not called who have knowledge of the entire affair. It is contended that the state, having means of doing so, should be held to show the entire transaction, and, not having done so in this case, the presumption is that to have shown it would have been against the state. We do not understand that such is the rule in this state, but, if it were, it has no application to this case, for it is apparent that nothing could have transpired before Murphy came onto the track that would justify the shooting as testified to by the state's witnesses. It is entirely clear from their testimony that Hudson did not act in self-defense. The state was not bound to put these men who had been examined before the grand jury on the stand, and thereby present them as worthy of credit. There was no error in overruling appellant's motion for a verdict.

IV. The defendant called Leon Hart, a brewer, of Chicago; Henry Blanchard, a waiter, of Chicago; John Landing, press feeder, of Cleveland, Ohio; and Archibald Hall, a pearl-button maker, of Brooklyn, N. Y.,—who testified quite strongly in defendant's favor. Appellant complains that the county attorney, in his closing argument, characterizes these witnesses as tramps. There was certainly much in their testimony to justify this characterization. It appears by their testimony that a gang

of men, conducting themselves as tramps usually do, were congregated at the foot of the embankment some time prior to the shooting.

V. Appellant complains of the eleventh paragraph of the charge, for that it did not state all the elements necessary to constitute murder in the second degree. If that paragraph stood alone, the complaint would be well founded, but in the twelfth paragraph this degree of the crime is fully and correctly defined. Complaint is also made of the fifteenth paragraph, defining the law of self-defense, and instructing that the burden was upon the state to show beyond a reasonable doubt that the defendant was not acting in self-defense. This instruction presents fully and fairly this subject, and we discover no error in it. Appellant asked an instruction to the effect that the testimony of witnesses was not to be weighed by the statements of counsel not founded upon the testimony, and complains of the refusal to give this instruction. The first six paragraphs of the charge are not set out at length, but it is apparent, from what is said of them, and what follows in the instructions fully set out, that the jury could not have been misled on this subject. They were explicitly directed to determine the case upon the facts and circumstances as shown in the evidence.

VI. Appellant's counsel insist that the punishment imposed is unreasonable and oppressive. True, it is the maximum period of imprisonment provided in the statute for the crime of manslaughter; and we think that, under the evidence, the jury might have been warranted in finding the defendant guilty of murder in the second degree. We do not agree with counsel that this was by no means an aggravated case, but, on the contrary, it seems to have been without mitigating circumstances.

We have examined the record with great care on the questions discussed by counsel, and generally with a view to determine whether reversible error appears in the record,

and reach the conclusion that the defendant had a full and fair trial, that there were no errors in the conduct of the case, that the punishment imposed is not excessive, and that the judgment of the district court should be AFFIRMED.