Miller vs. The State.

---

MILLER, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 8 — February 27, 1900.*

*Criminal law and practice: Murder: Premeditated design: Witnesses: Impeachment: Competency: Husband and wife: Evidence: Immaterial errors: Instructions to jury: Reasonable doubt: Improper remarks of counsel: Court and jury: Dangerous weapon: Manslaughter.*

1. In a prosecution for murder, uncontradicted evidence that during a quarrel between the deceased and the defendant the latter was pushed downstairs, and that he immediately went around the

Miller vs. The State.

house, procured an ax, returned with it to the second story, and struck the deceased, inflicting a mortal wound, is *held* to show ample time and opportunity for the formation of the premeditated design to kill which is necessary to murder in the first degree.

2. A witness whom it is sought to impeach by showing a statement made out of court contradictory to his evidence must first be asked whether he did not make the statement, fixing with reasonable certainty time, place, and person to whom it is claimed to have been made; and if he does not admit it testimony may afterwards be introduced showing that such statement was made.

3. Where a witness to a homicide had authorized her father to make a statement of the facts for publication, the newspaper article as published was inadmissible as foundation for impeachment, but she should have been asked directly as to her statements made to her father.

4. In a prosecution for murder the wife of the accused is not a competent witness.

5. After giving testimony as to the possibility or probability of temporary irresponsibility on the part of the defendant at the time of the homicide, a medical witness, on being asked whether insanity which suddenly takes place in a man and enables him to inflict a blow sufficient to produce death, and then suddenly disappears, was not known as "convenient insanity," replied that he had never heard that term. *Held*, that, although the question was objectionable, yet, in view of the answer, the error in permitting it to be answered was not prejudicial to the defendant.

6. The refusal of an instruction to the effect that if a witness had intentionally misstated or concealed certain facts the jury were at liberty to disregard *all* her testimony, was not error, such instruction being incorrect without the qualifying clause "unless such testimony was corroborated by other credible evidence."

7. Where a charge to the effect that if the jury found that a witness for the prosecution had been successfully impeached they might disregard her testimony, did not require the jury to find that she had intentionally falsified and did not add the qualifying clause above mentioned, such errors were not prejudicial to defendant.

8. A request by the district attorney that the court instruct the jury, on the subject of reasonable doubt, "that it is not every fanciful or shadowy doubt that a man could conjure up in his mind, but only such reasonable doubt as a reasonable man would have," cannot be successfully assigned as error, it being a request which he had the right to make, and, so far as it went, a correct statement of the law.

Miller vs. The State.

9. A failure to define reasonable doubt in the charge is not error where no specific instruction on the subject was asked on behalf of the plaintiff in error.

10. Abusive remarks of the district attorney in his argument to the jury, as to the vicious personal appearance of the defendant, are criticised as likely to call for reversal in a close case, but *held* not prejudicial in this case, in view of the clear evidence of guilt and the absence of any showing that the attention of the trial court was called to them.

11. Although the ax with which a homicide was committed by striking the deceased on the head should have been held, as matter of law, to have been a dangerous weapon within the meaning of sec. 4354, Stats. 1898, defining manslaughter in the third degree, yet to leave that question to the jury was not an error prejudicial to the defendant, where the jury found him guilty of murder in the first degree under instructions to consider and determine the question of premeditated design first, and to consider the question of manslaughter in the third degree only in case they found no such design.

ERROR to review a judgment of the circuit court for Eau Claire county: JAMES O'NEILL, Circuit Judge. *Affirmed.*

The plaintiff in error was convicted of murder in the first degree in the circuit court for Eau Claire county, and prosecutes this writ of error to reverse that conviction.

The leading facts of the homicide were not greatly in dispute. On the 15th of April, 1898, the defendant, *Christian Miller*, and his wife, occupied rooms on the second floor of a tenement house in the city of Eau Claire. The deceased, Willard Taylor, with his wife and children, occupied rooms in the same house and upon the same floor. There was an entry way eight feet long and four feet wide between the two suites of rooms, and from that entry way the front stairs led to the front door of the house and to the lower floor. There was another suite of rooms on the upper floor of the house, which was not occupied. On the afternoon of the said 15th day of April the deceased, Willard Taylor, was whitewashing an unoccupied room in the southeast corner of said house, and upon the same floor in which he and *Miller*

resided. At about 3 o'clock in the afternoon the defendant, *Miller*, entered the room where the deceased was at work, and accused the deceased of having killed or destroyed some tomato plants which he had been raising in a tin pan on the rear platform of the house. Thereupon a quarrel ensued between the two men, in which *Miller* testifies that Taylor struck him with a hammer, knocking him down, and jumped on him. During this quarrel, both Mrs. Miller and Mrs. Taylor came into the room, and Mrs. Taylor testifies that she saw no hammer. Whatever the fact was with regard to this struggle, the two men were finally separated, and each went to his own apartments. .

The defendant, *Miller*, testifies that while he was washing the blood from his head where he had been struck with the hammer the deceased came to his door, and pushed it open, and struck him again with the hammer, and threatened to kill him, and that he (defendant) grabbed the hammer and tried to take it from the deceased, and that they had a struggle in the entry at the head of the front stairs for the possession of the hammer; that Mrs. Taylor grabbed the hammer, and thereupon the deceased took a chair in one hand and the hammer in the other, rushed at the defendant, and pushed or knocked him down the front stairs, and that he thereby received an injury to the base of the spine, and was unable to recall anything that happened afterwards until he found himself in the woods. Mrs. Taylor testifies that *Miller* broke their door in and attacked the deceased with a hammer, and that deceased defended himself with a chair, and got hold of the hammer, and pushed *Miller* out into the hall, and that during this struggle *Miller* fell down the stairs. The undisputed fact is that after *Miller* was pushed down the stairs he went out of the front door of the house and went around the house, procured an ax, and came up the back stairway and through the hall, and the fight was renewed at the head of the front stairs, and *Miller* struck

Taylor with the ax upon the head, inflicting a wound from which he died at 10 o'clock on the same evening.

*Miller* fled into the woods, according to his own testimony, and remembered nothing of what had occurred until he found himself wandering in the woods. He returned to Eau Claire upon the second day following the homicide, and was arrested at his brother's house, while apparently endeavoring to elude the officers. The defense of insanity was not introduced.

*Jos. W. Singleton*, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General*, and oral argument by *R. F. Hamilton*, second assistant attorney general.

WINSLOW, J.   The killing of the deceased by the plaintiff in error with an ax was admitted in this case, but the contention in the trial court was that the homicide was not murder, because there was not sufficient time for the formation of the " premeditated design to effect death " which is essential to make the crime murder in the first degree.

Upon this question the following instruction was requested and refused, and the refusal is now assigned as error: "The court further instructs you that, though you may be convinced beyond a reasonable doubt that the defendant, at the time he delivered the blow, intended to kill deceased, still, unless you are convinced beyond a reasonable doubt that at the same time the defendant then entertained a premeditated design to effect the death of the deceased, you cannot convict the defendant of murder in the first degree, as a person may intentionally take the life of another and be guilty of manslaughter and of that only."

The court, after reading the statutory definition of murder in the first degree, charged the jury on this subject as follows: " You will note carefully the words ' premeditated design.' While the law requires, in order to constitute murder in the first degree, that the killing shall be wilful, delib-

Miller vs. The State.

erate, and premeditated, it does not require that the wilful intent, premeditation, or deliberation shall exist for any particular length of time before the crime is committed. It is sufficient if there was a design and determination to kill, distinctly framed in the defendant's mind, before he struck the fatal blow which caused the death of Willard Taylor. If you find from the evidence, beyond all reasonable doubt, that the defendant, at any time before striking the blow which caused Taylor's death, had formed in his mind a wilful, deliberate, and premeditated design to take his life, and that such blow was struck in furtherance of such design, without any justifiable cause therefor, as will be hereafter explained, then you should find defendant guilty of murder in the first degree." It will be at once seen that the instruction given by the court is in entire accord with the doctrines laid down by this court in the recent case of *Perugi v. State*, 104 Wis. 230, and that the instruction proposed by the plaintiff in error is just as plainly in conflict with the conclusions reached in that case. The whole subject of intentional killing and premeditated killing is so fully discussed in that case that it is deemed unnecessary to go over it again. It is sufficient to say that the evidence in the case before us shows ample time and opportunity for the formation in the mind of the premeditated design to kill, before the fatal blow was struck; and the circumstances seem to point very persuasively to the conclusion that such design was in fact formed when the plaintiff in error, after the first scuffle, went around the house and procured the ax and returned with it to the second story of the house to renew the conflict. While these considerations dispose of the main question which is presented by the record in the present case, there are a number of minor exceptions which require attention.

1. Mrs. Taylor, the widow of the deceased, was the main witness for the state, and upon her cross-examination she

Miller vs. The State.

was asked the question whether some parts of an account of the homicide published in an Eau Claire newspaper on the day after the killing were incorrect; the idea being to subsequently prove that Mrs. Taylor authorized her father to make a different statement of the facts, and that such last statement appeared in the same paper on the following day, and then to introduce this second publication as impeaching the testimony of Mrs. Taylor. An objection to the question was sustained, and very properly sustained. The manner in which the foundation must be laid for impeachment of a witness by showing statements made out of court contradictory to his evidence is well settled. The witness sought to be impeached must first be asked whether he did not make the supposed contradictory statement, fixing with reasonable certainty time, place, and person to whom it is claimed to have been made; and if he does not admit it testimony may be afterwards introduced showing that such statement was made. 3 Jones, Ev. §§ 847, 848. The supposed impeaching statement here, if any, was the one made to her father orally, and not the article printed in the newspaper, because it was not claimed that she made any statement to an employee of the paper; hence the foundation for impeachment should have been laid by direct questions as to her statements made to her father. No attempt was made to do this, and hence there was no error in the ruling complained of.

2. The testimony of the defendant's wife was offered and, on objection, excluded. The ruling was correct, under repeated decisions of this court. *Crawford v. State*, 98 Wis. 623.

3. Although the defense of insanity was not pleaded, the defendant contended that he had no conscious knowledge of his actions after he was thrown downstairs by the deceased, and that he was substantially irresponsible for his acts; and considerable testimony as to the possibility or

Miller vs. The State.

probability of such a mental condition was introduced. Dr. Selbach, having given some testimony upon the subject, was asked by the district attorney upon cross-examination this question: "Doctor, insanity which suddenly takes place in a man and enables him to inflict a blow sufficient to produce death, and then suddenly disappears, is what is known as 'convenient insanity,' isn't it?" An objection to this question was overruled, and the witness answered, "I have never heard the term 'convenient insanity.'" While the objection to the question might well have been sustained, still, in view of the nature of the answer, we are unable to see any prejudice to the plaintiff in error in allowing the answer.

4. An instruction was asked by plaintiff in error to the effect that, if Mrs. Taylor had intentionally misstated or concealed the facts as she saw and heard them at the time of the first encounter, then the jury were at liberty to eliminate from consideration *all* of her testimony. This was refused, and the court charged generally that it was claimed that Mrs. Taylor had made statements out of court contradictory to some of her testimony; that the jury were to inquire whether such contradictory statements had been made, whether the witnesses to such statements may not have misunderstood her, and whether the evidence ought to impeach her; that such contradictory statements might be considered as bearing on her credibility; and, if they found that she had been successfully impeached, they might disregard her testimony. There is no error here of which the defendant can complain. The instruction asked was erroneous, because it authorized the jury to disregard *all* of the evidence of the impeached witness, when there should have been added to it the qualifying clause, "unless such testimony was corroborated by other credible evidence." *Bratt v. Swift*, 99 Wis. 579. It seems probable that the instruction given by the court is subject to the same criticism, and to the further criticism that it did not require the jury to find that the wit-

ness had intentionally falsified; but neither of these defects was prejudicial to the defendant, but rather in his favor.

5. The court did not define the term "reasonable doubt" in his charge, and the district attorney, at the close of the court's charge, made the following request: "I ask the court to instruct the jury, on the subject of reasonable doubt, that it is not every fanciful or shadowy doubt that a man could conjure up in his mind, but only such reasonable doubt as a reasonable man would have." To this remark the plaintiff in error objected, and requested the court to give specific instructions on the question of reasonable doubt. The court then said, "I have in my charge a clause on reasonable doubt," and to this ruling of the court and remark of the district attorney exception was taken. Certainly there can be no error successfully predicated upon the request of the district attorney. It was a request which he had a right to make, and was, moreover, a correct statement of the law, so far as it went. Nor was it reversible error to fail to define reasonable doubt when no specific instruction was asked upon the subject. Had the counsel for the plaintiff in error drawn and presented a proper instruction upon the subject, the refusal thereof might or might not have been error, depending upon whether the subject was sufficiently covered in the general charge. *Buel v. State,* 104 Wis. 132. No specific instruction was asked, however; hence there was no error.

6. A number of exceptions were taken to remarks by the district attorney in his closing address to the jury, and these will be considered together. In referring to the defendant, he said he was "as vicious a looking man as any man ever looked on." In reply to a question by defendant's attorney as to whether he meant to say that this was a cold-blooded killing, he said, "It was a cold-blooded killing with a cold-blooded ax, and the man is cold still." He also argued that the defense was convenient insanity, as described by Dr.

Miller vs. The State.

Selbach; and in discussing the question whether there was time for premeditation he asked the jurymen to take out their watches and note the space of time which one minute consumes, and some jurymen did so, and, after the watches had been held a minute, he asked, " Is not one minute suffi-cient time for a man to premeditate the killing of a hundred men ? " With reference to each of these matters the record simply states that the defendant's attorney " objected and excepted." It does not appear that any ruling was asked, or made by the court, nor that the attention of the court was directed to the matters objected to. Such, ordinarily, should be the course when error is predicated upon remarks of counsel. It is undoubtedly true that the abuse of coun-sel's privilege may be so flagrant as to call for reversal, even in the absence of a ruling, but we are not inclined to hold that the matters complained of here constitute such a case. We are far from justifying the district attorney in his abus-ive remarks as to the vicious personal appearance of the de-fendant. Such a remark has no proper place in any criminal prosecution, and he should have been sharply reprimanded by the court for making it, if the remark was brought to the court's attention. A defendant is entitled to freedom from mere personal abuse of this nature, and we trust that we shall not be called upon to review a record containing such a departure from common fairness, as well as from pro-fessional ethics, in the future. In a case where the evidence of guilt was less clear and convincing, such a remark might well call for a reversal of the conviction; but we do not feel that we would be justified in reversing the present judgment on that ground, especially in view of the absence of any showing that the attention of the court was directed to it. See *Fertig v. State*, 100 Wis. 301.

7. The trial judge submitted to the jury instructions cov-ering three degrees of homicide,— murder in the first de-gree, murder in the second degree, and manslaughter in the

third degree. He first gave them the statutory definition of murder in the first degree as contained in sec. 4338, Stats. 1898, and gave very careful and full instructions as to premeditated design and the other essential elements of that crime. He then said, " If you do not find defendant guilty of murder in the first degree, I will submit to you whether he is guilty of murder in the second degree." He then defined murder in the second degree, and gave its essential elements, after which he said, "If you do not find defendant guilty of murder in the first or second degree, you may determine whether he is guilty of manslaughter in the third degree." Then followed the statutory definition of manslaughter in the third degree, and instructions as to that crime, as follows: "Sec. 4354, Stats. 1898, reads: 'Any person who shall kill another in the heat of passion without a design to effect death, by a dangerous weapon, in any case except such wherein the killing of another is herein declared to be justifiable or excusable, shall be deemed guilty of manslaughter in the third degree.' I will refer to excuse or justification hereafter. You will notice here, also, that the killing is without a design to effect death. In place thereof the words are 'heat of passion' and 'by a dangerous weapon.' (You will consider whether an ax employed as claimed in this case is a dangerous weapon. If you find that the killing was by a dangerous weapon, you should next consider whether it was done in the heat of passion.) You have heard the testimony of Mrs. Taylor as to the fight in the room when defendant and deceased first met. You have also heard the defendant's version of what took place there and until he reached the foot of the front stairway. (If you find from that time until the fatal blow was struck defendant had sufficient time to cool his passion, and that he actually formed a premeditated design to kill deceased, and actually struck the fatal blow in pursuance of that design, then defendant is not guilty of manslaughter in the

third degree, but his crime is murder.)   This is a vital ques-
tion in this case, and you should, early in your deliberations,
decide it.   *Was there a premeditated design to effect death?*
If you conclude there was no such design, then you may
say whether the killing was in the heat of passion and with
a dangerous weapon; and, if you find these conditions ex-
isting, you may find defendant guilty of manslaughter in
the third degree."

Exception was taken to that part of the foregoing instruc-
tion which submits to the jury the question whether the ax
employed in this case was a dangerous weapon, and it is
said that it was the duty of the court to hold as matter of
law that an ax directed at a vital part was a dangerous
weapon.   The prejudice which is claimed to have resulted
to the defendant from this alleged error is that under this
instruction the jury may have found that the blow was
struck in the heat of passion, but that the ax was not a
dangerous weapon, and that for that reason alone they may
have failed to find defendant guilty of manslaughter in the
third degree.

It may be admitted that the question as to what is a dan-
gerous weapon is ordinarily a question of law for the court
(2 Bish. New Cr. Law, § 680), and that in this case there
can be no doubt that an ordinary ax is a dangerous weapon
when the blow therewith is directed at the head, and should
have been so declared by the court; but the conclusion that
the defendant was prejudiced by the failure of the court to
so declare does not follow.   It is to be presumed that the
jury followed the directions of the court.   The court di-
rected them to take up the question of murder in the first
degree first, and, in substance, told them to consider and
settle the question of premeditated design before consider-
ing at all the question of manslaughter in the third degree,
and that if premeditated design was found the offense was
murder, unless justifiable or excusable homicide, and only

in case there was no such design could they find the defendant guilty of manslaughter in the third degree. The jury found the defendant guilty of murder in the first degree, and thereby declared that there was premeditated design to effect death; hence it seems clear that, following the directions of the trial judge, they never could have reached the question of manslaughter in the third degree, and hence the error in submitting the question of the character of the weapon could not have been prejudicial. Under the decisions of this court such an error is held to be favorable to the accused. *Dickerson v. State*, 48 Wis. 288; *Winn v. State*, 82 Wis. 571.

Some minor criticisms of the charge are made, which, however, are manifestly not well taken, and are not deemed of sufficient importance to require treatment in detail. The charge, as a whole, seems to be full and fair, and to have preserved all the legal rights of the defendant.

*By the Court.*— Judgment affirmed.