DILLON, Plaintiff in error, vs. THE STATE, Defendant in error.

*January 9—January 26, 1909.*

*Criminal law and practice: Homicide: State's duty to call eye-witness: Discretion: Instructions to jury: Manslaughter: "Heat of passion:" "Obscurement of reason:" "Deliberate:" "Premeditated:" Self-defense: Degree of offense: Consideration of various degrees: Prejudicial error.*

1. Whether or not in a criminal prosecution for homicide it is proper to require the state to call an eye-witness, a point not decided, it is within the discretion of the trial court to refuse a request in that behalf and such refusal will not be held erroneous unless there is an abuse.

2. In a criminal prosecution for homicide, to justify the giving of instructions on the law of manslaughter in the first degree it should appear from the evidence (1) that the killing was done without design to effect death; (2) that it was done by the act, procurement, or culpable negligence of the defendant; and (3) that it was done while defendant was engaged in the perpetration of a crime or misdemeanor not amounting to a felony or while he was attempting to commit such crime. Hence it is not error to refuse instructions on that subject, where the

evidence tended to show an assault or an assault and battery
by defendant upon the deceased, but which had become a com-
pleted act before the homicide.

3. In a criminal prosecution for homicide it is not error to refuse
to give as part of the definition of "heat of passion" a state-
ment that heat of passion does not contemplate such overpower-
ing disturbance as to destroy volition, the reasoning faculty,
even temporarily, where "heat of passion" was completely de-
fined in the charge, since, although the omitted statement might
properly be given, it is merely illustrative.

4. As a definition of "heat of passion" the term "obscurement of
reason" is not synonymous with the term "dethronement of
reason."

5. In a criminal prosecution for homicide an instruction that "heat
of passion" means such passion as amounts to temporary ob-
scurement of reason and renders the slayer incapable of form-
ing a premeditated design to kill, is not prejudicially erroneous,
where the term has been otherwise fully defined in the charge.

6. In a criminal prosecution for homicide the words "deliberate"
and "premeditated" may be used interchangeably in an instruc-
tion defining heat of passion.

7. Generally, in attempting to follow the statutory definition of a
degree of homicide in instructions to the jury, the words of the
statute should be given as they are found, with such explana-
tion as is necessary to direct the jurors by way of defining the
terms employed in the statute.

8. In a criminal prosecution for homicide an instruction that, if the
homicide occurred while the accused was in the heat of passion
rendering him incapable of forming a "deliberate," "premedi-
tated" design to kill, he should be convicted of manslaughter in
the third degree, is not erroneous, although neither of the
quoted words appears in the statute defining that degree.

9. In a criminal prosecution for homicide it is not prejudicial error
to give or refuse instructions on self-defense, where there is no
evidence tending to establish justifiable homicide and the ac-
cused disclaimed killing the deceased in self-defense.

10. It is unnecessary to instruct the jury as to any degree of murder
or manslaughter concerning which there is not sufficient evi-
dence to warrant conviction.

11. In a trial for homicide it is proper to instruct the jury that con-
sideration by the jury of a lower grade of offense would depend
on its failure to convict of a higher grade, and that the jury
need not consider a lower grade if it found accused guilty of a
higher one.

12. An instruction that the jury might not convict of a criminal of-

fense unless upon all the evidence, or want of evidence, the accused's guilt is established beyond a reasonable doubt, is error, unless cured in other portions of the charge.

13. The rule that an erroneous instruction is not cured, nor the presumption of prejudice thereby overcome, by a correct statement of the law on the same subject elsewhere in the charge, is subject to the qualification that prejudicial error does not follow where it is evident that no harm resulted from the erroneous instruction.

ERROR to review a judgment of the circuit court for Racine county: E. B. BELDEN, Circuit Judge. *Affirmed.*

The plaintiff in error (hereinafter called the defendant) was convicted of the crime of murder in the second degree in the circuit court for Racine county in November, 1907, and was sentenced to imprisonment in the state prison at Waupun for the term of seventeen years, pursuant to the judgment of conviction. To review such judgment he brings the case to this court on a writ of error and makes the following assignments of error:

(1) The refusal of the state to call the eye-witness Hans Gibson to the stand before resting its case. (2) In submitting to the jury the question of defendant's guilt of murder in the second degree. (3) In refusing to submit to the jury the question of defendant's guilt or innocence of manslaughter in the first degree. (4) In refusing to submit to the jury the instructions requested upon "heat of passion," "reasonable doubt," and "duty to retreat." (5) In charging the jury in reference to "heat of passion," "reasonable doubt," and "duty to retreat." (6) In so submitting the case to the jury as to require it to first pass upon the guilt or innocence of the defendant as to murder in the first degree, and in excluding from its consideration the lesser degrees of homicide until in each instance it had determined the innocence of the defendant as to all higher degrees of offense. (7) In repeating and reiterating all higher degrees of the offense of felonious killing when submitting the lower degrees

of such offense. (8) In saying to the jury that it was its duty to base its verdict as to affirmative matters upon the evidence or want of evidence in the case.

The evidence, in so far as it is material to the consideration of the errors assigned, will be found in the opinion.

The cause was submitted for the plaintiff in error on the brief of *Thomas M. Kearney* and *Mortimer E. Walker,* and for the defendant in error on that of the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *Fulton Thompson,* district attorney.

BARNES, J. 1. The defendant contends that the court, upon his request, should have directed the district attorney to call and examine one Hans Gibson, an eye-witness to the transaction; failing in this, that the court should have called said Gibson to the stand, to the end that the jury might have the benefit of the evidence of all the eye-witnesses to the homicide before the state rested its case. The denial of the requests made to this end is assigned as error.

The rule requiring the state to call eye-witnesses in a homicide case became well established in the English system of jurisprudence at a time when a defendant himself was denied the right to testify or to call witnesses in his own behalf, and when he was even denied the right of counsel. The rule no doubt was adopted to mitigate the rigor and harshness of the situation in which an individual, bound to defend himself in a case involving capital punishment, was placed by the English system of jurisprudence as it was. While the reason for the rule has ceased to exist, some courts still adhere to the ancient doctrine. *People v. Deitz,* 86 Mich. 419, 49 N. W. 296; *Territory v. Hanna,* 5 Mont. 248, 5 Pac. 252. The question is a new one in this state, and it is important in the administration of criminal law. To adopt it is to require the state to call a witness to establish its case whom the prosecuting attorney may believe is dishonest, or has been corrupted,

and is willing to commit perjury to aid the accused, either from motives of friendship, interest, or relationship. The pursuit of such a course might often place the state at an unfair disadvantage and preclude it from showing many things that might fairly discredit such a witness. The defendant has a right to secure the testimony of such a witness if he desires, and, this being true, it would not seem that he is deprived of any right essential to his making a complete defense by reason of the failure of the state to call the witness. It is true that it is often an advantage to have the right of cross rather than direct examination. It may also be advantageous to prevent the cross-examination of a witness by the opposite party, and, in the ordinary action, the party who calls a witness vouches for his probity to a certain extent. But, while it may be a tactical advantage to the defendant to require the state to call a hostile witness whom the law officers believe may not tell the truth, it by no means follows that it is an advantage to which the defendant is legally entitled. Prosecutions in criminal cases should be carried on without malice and without desire or intent on the part of the prosecution to secure a conviction where the evidence does not warrant it. On the other hand, it would seem to be proceeding beyond the bounds of reason or of justice to require the state in all instances to call all eye-witnesses to the commission of an alleged crime. The weight of authority in this country is certainly against the contention of the defendant. *State v. Eaton,* 75 Mo. 586, 594; *State v. McAfee,* 148 Mo. 370, 50 S. W. 82; *State v. Barrett,* 33 Oreg. 194, 54 Pac. 807; *Ross v. State,* 8 Wyo. 351, 57 Pac. 924; *Keller v. State,* 123 Ind. 110, 23 N. E. 1138; *Reyons v. State,* 33 Tex. Crim. 143, 25 S. W. 786, 47 Am. St. Rep. 25; *State v. Baxter,* 82 N. C. 602; *Hill v. Comm.* 88 Va. 633, 14 S. E. 330; *State v. Morgan,* 35 W. Va. 260, 13 S. E. 385; *State v. Payne,* 10 Wash. 545, 39 Pac. 157; *State v. Hudson,* 110 Iowa, 663, 80 N. W. 232; *Comm. v. Haskell,* 140 Mass. 128,

2 N. E. 773; 12 Cyc. 550, and cases cited under note 18; 14 Cent. Dig. CRIMINAL LAW, § 1570.

It is held in some jurisdictions that the right of the state to refuse to call an eye-witness in a criminal case is not arbitrary, but is subject to judicial discretion. *Carlisle v. State,* 73 Miss. 387, 19 South. 207; *U. S. v. Bennett,* 17 Blatchf. 357, Fed. Cas. No. 14,572; *People v. Robertson,* 67 Cal. 646, 8 Pac. 600; 14 Cyc. 549. While we do not decide that in no case is it proper to require the state to call an eye-witness, we do hold that it is within the discretion of the trial court to refuse such a request, and that such ruling will not be held erroneous unless there is an abuse of such discretion, and that this case does not disclose any abuse of the discretion of the trial court in this regard. We do not think the claim here made, that Gibson was the only eye-witness to the entire transaction that led up to the homicide, was sufficient to render it obligatory upon the state to call him, in view of the relations existing between him and the defendant and the apparently conflicting statements made by him in reference to the occurrence.

2. It is next contended that the evidence did not warrant a conviction for murder in the second degree, and that this degree of homicide should not have been submitted to the jury for consideration. No useful purpose would be served by stating the evidence justifying the submission of this degree of homicide. Under the decisions of this court in the cases of *Odette v. State,* 90 Wis. 258, 62 N. W. 1054; *Flynn v. State,* 97 Wis. 44, 72 N. W. 373; and *Johnson v. State,* 129 Wis. 146, 108 N. W. 55, the court was clearly right in its submission of murder in the second degree.

3. The defendant requested the court to submit manslaughter in the first degree, requesting a charge thereon in the language of sec. 4346, Stats. (1898), which request was refused. In order to justify such charge it should appear from the evidence (1) that the killing was done without design to effect death; (2) that it was done by the act, pro-

curement, or culpable negligence of the defendant; and (3) that it was done while defendant was engaged in the perpetration of a crime or misdemeanor not amounting to a felony or while he was attempting to commit such crime. There was testimony tending to show that the killing was done without design to effect death, and the evidence is practically undisputed that the killing was done by the defendant. If there was any credible evidence in the case sufficient to support a conviction and tending to show that the killing was done while the defendant was engaged either in perpetrating or in attempting to perpetrate a crime or misdemeanor not amounting to a felony, the charge requested should have been given. *Montgomery v. State,* 128 Wis. 183, 197, 107 N. W. 14; *Duthey v. State,* 131 Wis. 178, 182, 111 N. W. 222, and cases cited; *Terrill v. State,* 95 Wis. 276, 70 N. W. 356. The evidence in this case fails to show that the killing was done while defendant was engaged in the perpetration of a crime or misdemeanor not amounting to a felony, or in an attempt to perpetrate such crime or misdemeanor, and, this being true, it was not error to refuse to charge as requested. *Fertig v. State,* 100 Wis. 301, 75 N. W. 960; *Montgomery v. State,* 128 Wis. 183, 197, 107 N. W. 14. There is some testimony tending to show that, a short time before the shot was fired which resulted fatally, the defendant kicked, or kicked at, the deceased, under such circumstances as might render him guilty of either an assault or assault and battery. There is no testimony which has even a tendency to show that the killing was done while the defendant was engaged in the perpetration of such assault. The testimony of the witnesses is not in harmony as to the length of time that elapsed between such assault and the shooting. The sworn testimony given on the trial is to the effect that after such assault took place the deceased retreated to the door of the saloon, and either went out or went partially out, the defendant following him up, for the purpose, he says, of closing the door. The de-

ceased pushed the door open, and, according to some of the witnesses, kicked the defendant, whereupon the defendant shot him. Under this testimony the defendant was doing what he had a perfect right to do, in closing the door of his place of business, and he was not engaged in the perpetration of any misdemeanor or crime below the grade of a felony when the revolver was discharged. The evidence that comes closest to connecting the assault with the shooting is the *ante mortem* statement of the deceased, offered upon the trial, but we think a fair construction of this testimony does not lead to the conclusion that the killing was done while the defendant was perpetrating a crime less than a felony, but that the assault referred to was a completed act before the pistol was discharged.

4. Error is assigned upon the charge of the court in reference to "heat of passion," and upon the refusal of the court to charge as requested by the defendant. The court charged the jury as follows:

"The term 'heat of passion,' as used in this section and in these instructions, means such passion as amounts to temporary obscurement of reason, and renders the slayer incapable of forming a premeditated design to kill. The heat of passion which will reduce what would otherwise be murder to manslaughter in the third degree is such mental disturbance, caused by reasonable, adequate provocation, as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason; make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree; and to cause him, uncontrollably, to act from impelling force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposition."

Excluding the first sentence of the charge, the remaining portion of it is taken *verbatim* from the definition of "heat of passion" in *Johnson v. State,* 129 Wis. 146, 160, 108 N. W. 55, 59. In the *Johnson Case* the court said, in addition to the language quoted, that "such heat of passion does not

contemplate such overpowering disturbance as to destroy vo-
lition, the reasoning faculty, even temporarily."

It is urged that the court erred in refusing to give as part
of his definition of "heat of passion" the sentence last quoted,
and also in instructing the jury that the term meant "such
passion as amounts to temporary obscurement of reason,"
which rendered the slayer "incapable of forming a premedi-
tated design to kill." Referring to the omission from the in-
struction given of the sentence found in the *Johnson Case*,
we do not think it is any part of the definition of heat of pas-
sion in that case. It is a statement intended to be illus-
trative merely, and one that might very properly have been
given, but one which we do not think it was error to refuse.
The affirmative definition of heat of passion was given in its
entirety. There are many things that heat of passion does
not contemplate, and the statement that "heat of passion,"
as used in the statute, "does not contemplate such overpower-
ing disturbance as to destroy volition, the reasoning faculty,
even temporarily," really adds nothing to the definition.

The charge of the court to the effect that "the term 'heat
of passion,' as used in this section and in these instructions,
means such passion as amounts to temporary obscurement of
reason, and renders the slayer incapable of forming a pre-
meditated design to kill," was perhaps superfluous, as the
term was otherwise fully defined in the charge. The term
"obscurement of reason" is not synonymous with the term
"dethronement of reason," which has been held to consti-
tute an incorrect definition of "heat of passion." *Johnson
v. State,* 129 Wis. 146, 163, 108 N. W. 55, 61; *Duthey v.
State,* 131 Wis. 178, 111 N. W. 222. The word "obscure"
means not clear, full, or distinct; clouded; imperfect. Webst.
Dict. This court has apparently construed the words "tem-
porary dethronement of reason" as being equivalent to tem-
porary insanity. *Duthey v. State,* 131 Wis. 178, 111 N.
W. 222.

Under the definition formulated in *Johnson v. State* the

mind must be "deaf to the voice of reason," and the defend-
ant must be "incapable of forming and executing that dis-
tinct intent" essential to the crime of murder in the first de-
gree. If there is any essential difference between such a
mental condition and one where the mind is obscured, clouded,
or imperfect, it would seem that the portion of the instruction
complained of was favorable to the defendant. Any con-
clusion that it was harmful would have to be reached by a
process of reasoning too refined for practical purposes. The
instruction criticised was fully justified by the language
used in *Perugi v. State,* 104 Wis. 230, 240, 80 N. W. 593,
and we do not think the *Johnson Case* should be construed as
overruling what is there said in reference to the meaning of
"heat of passion."

Exception is also taken to the remarks subsequently made
in the charge of the court on "heat of passion," by which
the jury was instructed: "If you find . . . that the homicide
was committed while the defendant was in the heat of pas-
sion, such passion as amounted to temporary obscurement
of reason, as hereinbefore explained, rendering him inca-
pable of *deliberate, premeditated* design to kill," a verdict of
guilty of manslaughter in the third degree may be returned,
provided the other elements essential to the commission of
the offense are found to exist. This statement simply
amounted to a repetition of a portion of what was said in
the definition previously given, and in the instruction the
attention of the jury was called to the meaning of the term
"heat of passion" as before explained. There was no error
in this portion of the instruction, at least in so far as it re-
lated to "heat of passion."

5. Exception is also taken to the following portion of the
charge:

"If, therefore, you find from the evidence, beyond a rea-
sonable doubt, that at the time and place charged the defend-
ant shot Jacob C. Best, thereby causing his death, . . . but

do find, beyond a reasonable doubt, that the homicide was committed while the defendant was in the heat of passion, such passion as amounted to temporary obscurement of reason, as hereinbefore explained, rendering him incapable of forming a *deliberate, premeditated* design to kill, and further find that such homicide was committed by a dangerous weapon, without any design to effect death, then you are at liberty to find the defendant guilty of manslaughter in the third degree, unless you find that such homicide was justifiable or excusable as hereinafter explained."

The defendant contends that the court not only erred in defining "heat of passion" in this portion of the charge, but also in using the words "deliberate" and "premeditated" before the word "design." Neither of the objectionable words appears in the statute defining manslaughter in the third degree. The statute defining murder in the first degree does not use the word "deliberate" in connection with the words "premeditated design."

The argument to support the alleged error is that a "deliberate, premeditated design" means something more than a mere design, and that to require the mind to be so dominated by passion as to be incapable of a "deliberate, premeditated design" was to require more than incapacity to simply form a "design." The words "deliberate" and "premeditated" may be used interchangeably in the connection in which they are used here. *Perugi v. State,* 104 Wis. 230, 238, 80 N. W. 593, 595. There is no difference between the terms "design" and "premeditated design" as used in our statutes defining murder and manslaughter. This subject was fully discussed by RYAN, C. J., in *Hogan v. State,* 36 Wis. 226, and his conclusions are summed up in the following paragraph:

"We take the 'premeditated design' of our murder in the first degree to be simply an intent to kill. Design means intent, and both words essentially imply premeditation. The premeditation of the statute does not exclude sudden intent, and need not be slow or last long. This very plainly

appears, not only by the force of the words used, but also by the apparent use, throughout the definitions of murder and manslaughter, of the terms, 'design' and 'premeditated design,' to effect death, as coequal terms."

While the decision in the *Hogan Case* in this regard might be held to be modified to some extent by the holding in *Terrill v. State,* 95 Wis. 276, 70 N. W. 356, and *Sullivan v. State,* 100 Wis. 283, 75 N. W. 956, the latter cases were considered in *Perugi v. State,* 104 Wis. 230, 240, 80 N. W. 593, and in so far as they were in conflict with the decision in *Hogan v. State* the court declined to follow them and expressly followed the doctrine quoted from the *Hogan Case.* To the same effect are *Miller v. State,* 106 Wis. 156, 81 N. W. 1020, and *Cupps v. State,* 120 Wis. 504, 542, 543, 97 N. W. 210, 98 N. W. 546. In the case last cited the question is exhaustively discussed, and reasons for the varying lines of authorities upon the subject are pointed out. In attempting to follow the definition of one of the degrees of homicide as found in the statute, it is a safe general rule to give the words of the statute as they are found, with such explanations as are necessary for the direction and the guidance of the jurors by way of definition of the terms employed in the statute. We do not think, however, that any error was committed in giving the instruction.

6. Error is assigned because the court refused to give the following instruction:

"You are further instructed that if you find from the evidence the defendant was assaulted in his place of business by the deceased in such a way as to induce in defendant a reasonable belief of losing his life or of suffering great bodily harm, he was not obliged to retreat or flee from the deceased. He may stand his ground and repel force by force, and if need be, of which you are the sole judges under the instructions I have given you, kill his adversary."

Two other instructions given by the court, and bearing upon the question of self-defense, are excepted to. These

exceptions can well be disposed of by saying that there was no testimony in the case tending to establish a case of justifiable homicide as defined by subd. 2, sec. 4366, Stats. (1898). None of the witnesses for the state testified to any fact which would even remotely tend to establish a defense of self-defense. It is true the witness Gibson did testify that, while the parties were four feet apart and the defendant was holding a revolver in his right hand, the deceased kicked him, and it is also true that the defendant testified to the same fact. The naked facts so testified to did not show any real or apparent necessity for taking the life of Best, and the defendant does not claim or testify that there was any necessity for his doing so, and disclaimed killing the deceased in self-defense. He testified that the discharge of the gun was involuntary and unintentional, and that he had no design or purpose to kill his alleged assailant, and did not know as a matter of fact that Best was shot until some time after he left the saloon. The cases heretofore cited show that it is unnecessary to instruct the jury as to any degree of murder or manslaughter concerning which there is not sufficient evidence to warrant a conviction. The same rule applies to the submission of justifiable homicide. *Fertig v. State,* 100 Wis. 301, 75 N. W. 960; *Montgomery v. State,* 128 Wis. 183, 107 N. W. 14; *Bird v. State,* 77 Wis. 276, 45 N. W. 1126.

7. It is insisted that the court made an erroneous submission to the jury, in that he in effect instructed it that it must first take up the question of murder in the first degree, and, if it did not find the necessary facts to convict, it should then take up the next lower degree of homicide, and so proceed down the line until it came to the questions of justifiable or excusable homicide. In instructing the jury as to each particular degree of homicide the court said that the consideration by the jury of the lower grade would depend and be conditioned upon its failure to find the defendant guilty of some

higher grade of offense. The order in which the jury was instructed to take up the consideration of the case was entirely proper, and it was proper for the court to say to the jury that it need not consider a lower grade of offense if it found the defendant guilty of a higher one.

8. Among other things the court instructed the jury as follows:

"The state does not desire the conviction of any person charged with the commission of an offense unless upon all the evidence in the case, *or want of evidence,* considered under all the rules of law applicable thereto as given to you by the court, and in the face of the presumption of innocence and all the protection with which the law guards one accused of crime, such person's guilt is established to the satisfaction of the jury, and each member thereof, beyond a reasonable doubt."

The vice of this instruction consists in the fact that a jury might very well interpret it to mean that it would be justified not only in convicting on the evidence but also because of the want of evidence. Obviously, this is not what the court intended to say to the jury; but the intention in the mind of the court, except as expressed, is not before the jury for consideration. What the court evidently had in mind was that a reasonable doubt might arise from want of evidence, and that a defendant might be entitled to acquittal on the state of the evidence itself, or because of lack or want of evidence on some material point. To say to the jury that it could convict for want of evidence, as was done in this case, is error, unless it is cured in other portions of the charge.

In charging generally, and under the various degrees of homicide submitted, the court iterated and reiterated a dozen times that unless the jury was satisfied, beyond a reasonable doubt, from the evidence offered, of the guilt of the defendant, it was its duty to acquit. In *Perkins v. State,* 78 Wis. 551, 47 N. W. 827, the court gave an erroneous charge on the law of self-defense. The error was repeated in short,

Dillon v. State, 137 Wis. 655.

pithy instructions, and it was held that it was not cured by a correct statement of the law made in a long and an involved sentence. It does not follow, however, that, because a statement in a charge is inaccurate, reversible error results therefrom. *Richards v. State,* 82 Wis. 172, 182, 51 N. W. 652. The language in *Schmidt v. State,* 124 Wis. 516, 519, 102 N. W. 1071, to the effect that "an erroneous instruction is not cured, nor the presumption of prejudice therefrom overcome, by a correct statement of the law on the same subject elsewhere in the charge," is subject to the qualification that prejudicial error does not follow where it is evident that no harm resulted from the erroneous instruction. *Eggett v. Allen,* 106 Wis. 633, 638, 82 N. W. 556; *Annas v. M. & N. R. Co.* 67 Wis. 46, 63, 30 N. W. 282; *Middleton v. Jerdee,* 73 Wis. 39, 40 N. W. 629. The solecism in the language here used was so obvious, and a correct statement of the law was so repeatedly given, that it would seem to be entirely without the field even of possibilities that the jury could have been misled. We find no prejudicial error in the record.

*By the Court.*—Judgment affirmed.