MONTGOMERY, Plaintiff in error, vs. THE STATE, Defendant in error.

*March 27—April 17, 1906.*

*Criminal law and practice: Change of venue: Prejudice of people: Former jeopardy: Preliminary examination: Killing of wife: Presumptions from marital relation: Instructions to jury: Manslaughter: Heat of passion: Testimony of accused not conclusive against him: Evidence: Premeditated murder.*

1. The denial of a motion for change of venue on account of prejudice of the people of the county is *held* not to have been error, the affidavits as to the fact of prejudice being conflicting.

2. Where defendant had been arrested on a charge of assault and had pleaded not guilty, but after adjournment and before the trial commenced the case had been *nolled* and defendant discharged, this did not constitute a former jeopardy barring a subsequent prosecution for murder arising out of the same transaction.

3. Defendant was arrested on complaint and warrant charging murder; he pleaded not guilty, and an adjournment was had; on the adjourned day an examination was held and an inquest taken; the justice found there was probable cause to believe defendant guilty of murder, and ordered the proceedings to be stopped, and committed defendant to jail to answer for the offense. *Held*, that there was a sufficient preliminary examination.

4. Upon the trial of one charged with murder of his wife the court properly refused to give an instruction to the effect that there was a powerful presumption, resulting from the marital relation, that the deceased was not killed by her husband or that there was not malice aforethought.

5. A requested instruction should be so drawn that it can be given without change.

6. In prosecutions for serious crimes a requested instruction should not be refused on account of a mere verbal inaccuracy, but the trial court should correct the inaccuracy and give the instruction.

7. The fact that defendant testified positively that he was not angry at the time when he is charged with having killed another person did not so conclude him that he was not entitled to have submitted to the jury the question whether the killing was done in the heat of passion so as to make the offense manslaughter in the second or fourth degree. *Perugi v. State*, 104 Wis. 230, on this point, overruled.

8. Upon the evidence in this case—showing, among other things, that if defendant killed his wife, whose death was caused by dislocation of the vertebræ of the neck, he did so either by a blow upon the neck or by causing her to fall from the buggy in which they were riding in the daytime past the homes of friends and neighbors,—it is *held* that a verdict of premeditated murder was not warranted.

ERROR to review a judgment of the circuit court for Monroe county: J. J. FRUIT, Circuit Judge. *Reversed*.

The plaintiff in error, hereafter called the defendant, was convicted before the circuit court for Monroe county of having

murdered his wife, Blanche Montgomery, on the 30th day
of May, 1903, and prosecutes this writ of error to reverse the
judgment.

A motion by the defendant for change of venue on account
of the prejudice of the people was first interposed and over-
ruled, after which successive pleas in bar and abatement were
overruled, and the case proceeded to trial upon a plea of not
guilty.

It appeared by the evidence that the defendant was a
farmer who lived upon a farm five miles east and a quarter
mile north of the village of Warrens, Monroe county, Wis-
consin. He was about forty-one years of age at the time of
the alleged murder, had been twice married, and lived with
his daughter Nina, aged sixteen years, the child of his first
wife. He was a man somewhat addicted to the use of liquor,
but was not what would be called a drunkard, although he
was shown to have committed several minor offenses while
under the influence of liquor. His second wife, Blanche
Montgomery, the deceased, to whom he was married in the
year 1900, was about twenty-five years of age at the time of
her death, and weighed about 130 pounds. She was a coun-
try school teacher, and appears to have taught school at vari-
ous places in the vicinity of her husband's residence a con-
siderable part of the time after her marriage. She was a
nervous and excitable woman, of uncertain temper. Very
little appears as to the relations of the parties after the mar-
riage, but it does appear that the defendant had suspected
his wife of infidelity with other men, and had some letters
in his possession written by his wife to him, in which she
confessed intimacy with other men. Montgomery testified
that he never believed these statements, but still it appears
that there was some excited talk between them about these
matters at times, and that the defendant preserved them and
threatened to show them to the father of the deceased.

The school which the deceased was teaching closed on Fri-

day, May 29, 1903, and the defendant on that day drove from his farm to Warrens, left his team there and went down to Stowell, where his wife had been teaching school, stayed with her all night at Stowell, and on the following day the two came back to Warrens by rail. They arrived at Warrens early in the day and stayed there until late in the afternoon, visiting some friends, Mr. and Mrs. Gray. At about 5:30 o'clock in the afternoon they started for home with a two-horse team hitched to an open single-seated buggy, or road wagon, which had side springs and a high back, but no top. The deceased appeared at that time to be in good health. They had both drunk some beer during the day, and the defendant had a small bottle partly filled with whisky with him, but it did not appear that either of them was intoxicated. The road from Warrens to the defendant's residence ran over a comparatively level piece of ground, and ran straight east about five miles and then turned to the north. There was a slight hill about one-half mile east of Warrens, and at several places on the road there were swampy pieces of ground and the roadway was made of corduroy. Part of the road was exceedingly sandy, but a part was hard. There was a telephone line running from Warrens as far east as the defendant's residence, and telephones at the following residences along the road, viz.: (1) At Beck's, or the "Prairie Farm," one and three-quarter miles from Warrens; (2) at Barden's residence, about a mile further on; (3) at Andrew Scott's residence, about three and one-third miles from Warrens; (4) at Proviance's, about three and three-quarter miles from Warrens; (5) at George Green's residence, five miles east of Warrens; lastly, at the residence of the defendant. These telephones were all on one common line, so that a call by any one on the line would ring the bells in the other houses. The death of Blanche Montgomery was caused by either intentional or accidental violence, which she received upon the

'road home from Warrens, or within a few moments after her arrival at home.

The defendant testified as to this trip substantially as follows: That they started out towards home, and as they went along he, the defendant, commenced to read some letters which they had received in the mail, and that while he was doing this his wife asked for the whisky bottle, which was not over one third full, saying that she felt kind of faint; that she took a drink and he took a drink, and that he threw the bottle away; that then she caught him around the neck with her arms, and told him that she had been wicked, and told him about her improper relations with a man at Stowell; that then he took the letter out of his pocket, and she asked him not to send it to her father, and he told her that if she didn't stop telling so many lies he would send it, and she asked him to destroy it, and he said he was going to keep it, and that she tried to grab it, and when she could not she "clutched" right into his face; that he caught hold of her arm and asked her if she was drunk or crazy, and held her, and she stopped struggling, and after about ten rods she either started to jump out of the buggy or fell out, as the horses were walking, and he jumped out and helped her in, and she acted kind of dazed, and he asked her what was the matter, but she didn't answer; that they then drove along a little ways, when he filled his pipe and lighted it, and she looked as if she was going to faint away, and he put his arm around her and she leaned against him; he started the horses at a trot, and took the whip to start them faster, and as he returned the whip to the socket she pitched right forward and he thought her face struck the "ex" of the buggy near the hub, and she fell onto the ground and the buggy ran over her, and he stopped the team as quick as he could, jumped out, and went back and picked her up; that she had some bruises on her nose and lip, and he led her back to the buggy, and

when she got close to the buggy she commenced to tear around, tried to get away, and "hollered," frightened the team so that he had to run and catch them and tie them to a telephone post, and his wife started back toward Warrens, and as soon as he got the horses tied he ran and caught her and led her back to the buggy; that she tore her hair and "hollered" some, and that he got her to the buggy after a while and she started toward home and then he got her to the buggy again and she said, "Are we pretty near home?" and he said, "We will be pretty soon," and she climbed into the buggy, and he untied the horses and got in and started for home with the horses on the run; that he knew there was something wrong; that he thought the liquor had gone to her head; that he knew she had hurt herself, and he thought the best thing would be to get her home; that this occurrence was just west of the "Prairie Farm."

He further testified that after she got into the buggy she sat down leaning towards him with her head against him on his right side; that they proceeded until within about three fourths of a mile of defendant's house, near the Green residence, when she raised up and wanted to sit up, and said she felt all right; that her nose was bleeding after she left the "Prairie Farm," and she held her handkerchief to it and the handkerchief became soaked with blood, and he took his own out of his pocket and gave it to her just as they were crossing a bridge near the Green farm, and after they crossed the bridge the team swung off to the right a little; that he straightened the horses up into the road and started up fast, and reached out for the whip, and as he did so his wife fell out of the buggy in between the wheels; that he grabbed for her with his right hand; that his hold broke loose and then he grabbed for her leg; that she finally fell onto the ground and was dragged some distance, the horses running, and that he stopped the horses as soon as he could, and himself fell out of the buggy, the hind wheel passing over him; that he still

had hold of the lines, and stopped the horses and cramped them across the road, and ran and got his wife, carried her in his arms and lifted her into the buggy on the left-hand side of the seat, and drove towards home holding his wife with her face on his breast; that he drove as fast as he could from there to the corduroy east of Green's, slowed up across the corduroy, and then drove fast till he reached home, and that his wife was unconscious during this time, as he thought. He further testified that when he got home he drove up to the house, and Nina came out, and he took his wife out of the buggy, had one arm around her body, and they walked into the house, and after he got into the house they got some water to wash her face, which was covered with blood; that Nina took care of the team while he bathed his wife's face, and found that her one eye was swelled shut and her face was bruised; that he thought she revived; that he laid her on the bed and went to the telephone and called Dr. Sidell, and told him to come out as quick as he could; that his wife recognized the telephone ring and asked him what he was ringing for, and he said for the doctor; that soon after Nina came in, and his wife called her by name and wanted to get up off the bed, and he helped her out of the bedroom to the water pail; that he thought she used her lower limbs; that she stood on her feet without help; that they gave her a drink of water, and she sat down in a chair, and she asked Nina if she was at home, and spoke of a little colt which she wanted to see, and he told Nina to go and drive the colt up from the pasture, and Nina started out, but just after she started his wife called Nina, and he went to the door and called Nina back, and as he did so his wife, who had been sitting in a chair, fell straight forward out of the chair in a heap, and he picked her up and sat her in the chair, and Nina came in, and he said, "My God, Nina, I believe Blanche is dead or dying; let's take her out into the air;" and they carried her out into the air, and she sat upon the ground with her head upon his arm and

said, "*Sam,* I did;" that Nina got a pail of water, and he used it on her face and hands, and that she might have lived a minute after they got her out of doors, but not more; that two or three minutes after that Mrs. Cecil Green and her father, Mr. West, came, and then they picked her up and carried her into the house; that he called Mr. Proviance's people by telephone right after his wife died, and they came over. The daughter, Nina, testified to substantially the same state of facts as to what occurred after her father and mother reached home.

Dr. Sidell testified that he was called by telephone, at about half past 7 in the evening, and that the party calling him said, "Come out to *Montgomery's* as fast as God will let you," and he said, "Who is sick?" and the answer was, "My wife," and he said, "What's the trouble?" and the answer was, "Never mind what the trouble is, but come just as fast as you can." That he arrived there about half past 8, and the defendant came from the bedroom with the lamp in his hand, and said, "There is no hope;" that he went into the room, found the deceased lying on the bed, and asked defendant when she died, and he said he did not know, that she quit breathing about the time he 'phoned; that he found the upper lip enormously swollen and cut, left eye and left side of the face swollen badly, also a swelling on the right side above the ear; that the hands were covered with blood, but not bruised; that the skin was not broken, only where cut under the lip a trifle; that the hair was tousled up and mixed with sand and grit, and wet; that the clothing was wet, and her skirt and hose were wet; that he thought the woman had been dead about an hour.

It further appeared that a *post mortem* examination was held on the body on Monday, June 1st, by Drs. Simonson, Moseley, and Sidell. Dr. Simonson testified that he found a large swelling on the left side of the head, and thought it was a fracture, and cut around the skull and pushed the scalp

back over the face, and then found a large blood clot, but no fracture; that in doing this the body was in a sitting position, and the head fell forward, and he came to the conclusion that there must be a fracture of some of the cervical vertebræ; that there was a large swelling over the eye with a cut; that the lip was very much swollen and incised; that there was a small abrasion on the left ear, and an abrasion on the left arm and right hand, as though the skin was torn off by friction; that they found that the first vertebra—*i. e.* the first bone of the neck—was separated from the second bone about three fourths of an inch, and that the process of the second vertebra, called the "odontoid process," upon which the first vertebra turns the head, was broken off; that if this process is broken off the head will fall forward, and the odontoid process will press on the spinal cord, and there will be, at least, paralysis from that point to the feet at once, or instant death; that a person in that condition could not walk; that the blood clot on the base of the brain was caused by some injury on the top of the head on the left side of the head; that it would be possible to cause this fracture by a severe blow with the fists upon the process or upon the neck, or that it could have been caused by the use of the hands in wrenching the head with great force; that from the conditions found he thought that the deceased could not talk after the injury, not even a word; that he asked *Mr. Montgomery* how this happened, and *Montgomery* said they had a quarrel, and his wife threw herself out of the buggy.  Dr. Moseley testified to substantially the same facts, and said he thought it would have been impossible for a person to walk after receiving these injuries, and he didn't think there could have been any power of speech; that the injuries might be produced by a blow or by a fall upon the head; that the most usual manner of producing such injuries is by a fall; that in his judgment the two injuries, the fracture and the dislocation, occurred at the same time; that if the team was moving along rapidly, and

she struck on her head, the force might be great enough to cause a dislocation of the first and second vertebræ.

Several persons testified that they saw the defendant and his wife upon their trip home. The witness Roy Lamb testified that he saw *Mr.* and Mrs. Montgomery on the road; that *Montgomery's* team was tied to a post near the "Prairie Farm," and when he first saw them they were walking westward toward the buggy, Mrs. Montgomery being about five or six feet ahead; that she got into the buggy, and *Montgomery* untied the team and got in, and they started off on the run, with Mrs. Montgomery on the right side; that Mrs. Montgomery got into the buggy alone, and she kind of leaned over against him. Jacob Beck, a farmer who lived a mile and a half east of Warrens, on what is called the "Prairie Farm," testified that he saw them after they had got about twenty rods past the house, and *Montgomery* was putting the whip on the horses and they were running, and that the defendant was sitting on the right-hand side, and the deceased was kind of stooped or humped over against him. Mrs. Beck testified to the same situation, except that she thought Mrs. Montgomery sat on the right side. Peter Nelson testified that he lived two miles east of Warrens, and saw the Montgomerys as they were driving home, about the middle of a certain piece of corduroy road about eighty rods long; that he had a load of stumps on his lumber wagon and turned out as far as he could, and *Montgomery* turned out on the other side and passed, and then commenced driving fast; that the deceased was sitting on the right side, and was hanging over behind *Montgomery's* back; that her hair was hanging right back, and blood was streaming down her face. Herbert Barden, who lived about three miles east of Warrens, testified that he was standing in the garden with his three daughters, and heard the team coming across the corduroy, and saw *Montgomery* and his wife; that his wife was sitting on the right-hand side, but leaning over, and the defendant spoke to her and said, "Sit up," and

Montgomery v. State, 128 Wis. 183.

as he said "Sit up" the second time the team started on a run, and then *Montgomery* struck down this way (indicating), two or three blows, and said, "Sit up, God damn you, or I'll kill you," and he could not tell what part of the body he struck, but it must have been the side or shoulder; that he thought it was a man that was intoxicated; that the deceased did not sit up, but remained in the same position; that he could see and hear the blows; that his house stood about twenty-six rods back from the road, and the garden where he was standing was just west of the house. Two of the witness Barden's daughters testified to practically the same facts. James Scott, who lived on a farm three and one-third miles from Warrens, testified that he saw the defendant and his wife driving home; that the horses were running and *Montgomery* was whipping them; that Mrs. Montgomery was sitting on the right side of the buggy and leaning against the defendant. Mrs. Scott testified that she saw them, and that the team was running; that the deceased seemed to be reclining on the back of the buggy; that she had no hat on; and that her hair was hanging down the back of the neck. Pearl Green, a daughter of Cecil Green, who lived about five miles east of Warrens, testified that she saw the defendant on the road about eighty rods east of her house; that the defendant was on the south side of the buggy, and seemed to be picking up something kind of heavy; that she saw him get into the buggy, and saw him go past her place; that the horses were on a run; that there was a woman with him, who was sitting on the left side. T. G. West testified that he saw the parties at the same place, and that *Montgomery* was on the right side of the buggy and a woman on the other side; that they were driving at a pretty good gait; that the woman was leaning toward the defendant with her head well down and her hair disheveled, so that he could not recognize her. There was also evidence of other witnesses that the horses were on the run as they passed Green's. There was also testimony to a number of statements

made by *Mr. Montgomery,* to the effect that the deceased pitched out of the buggy and was run over. The defendant testified that he was not angry at any time between Warrens and the time he reached home that night—he was perfectly cool.

The defendant requested the court to give the jury the definitions of manslaughter in the fourth degree as stated in sec. 4362, Stats. 1898, and the definition of manslaughter in the second degree as stated in sec. 4350, Stats. 1898, and to instruct the jury that they might find the defendant guilty of either of these degrees of manslaughter. The court refused to give these instructions. Further statement of the facts of the case, necessary to an understanding of the points decided, will be found in the opinion.

*A. H. Smith,* attorney, and *F. J. Smith,* of counsel, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General* and *A. C. Titus,* assistant attorney general, and by *Howard Teasdale,* of counsel, and oral argument by *Mr. Titus.*

WINSLOW, J. The questions raised which we deem it necessary to decide will be considered in their natural order.

1. Upon the motion for change of venue there were filed a large number of affidavits tending to show that there was much popular excitement in a considerable part of Monroe county immediately following the death of Mrs. Montgomery, and much adverse feeling against the defendant; on the other hand, there was a much larger number of affidavits from many men of standing in various parts of the county to the effect that there was no popular prejudice against the defendant, and that he could receive a fair trial. The question was one of fact for the trial court, and we cannot say from the record that it was wrongly decided.

2. The defendant filed a special plea in bar on the ground

of former jeopardy. By this plea it appeared that the defendant was arrested on June 1, 1903, upon a complaint and warrant charging assault, and taken before a justice of the peace, where he pleaded not guilty, and the case was adjourned; that he appeared on the adjourned day and demanded trial, whereupon the district attorney *nolled* the case and the action was dismissed and the defendant discharged. A demurrer to this plea was sustained, and we think rightly. Conceding that a prosecution and acquittal of assault would bar a prosecution for murder (which is not decided), the accused must actually be put on trial—that is, the trial must have commenced—before he can be said to have been in jeopardy. Such was not the case here. *McDonald v. State,* 79 Wis. 651, 48 N. W. 863.

3. After the plea in bar had been overruled, a plea in abatement on the ground that the defendant had not had a legal preliminary examination was filed, and a demurrer to the plea was sustained. The plea showed, in brief, that the defendant was arrested on the 10th of June, 1903, upon a complaint and warrant charging murder in the first degree; that he pleaded "not guilty," and an adjournment was taken; that on the adjourned day an examination was held and an inquest taken, and the justice found that there was probable cause to believe the defendant guilty of murder, and ordered the proceedings to be stopped and the defendant sent to jail to appear before the circuit court to answer thereto, and issued a commitment under which the defendant was committed to the common jail of Monroe county. This was entirely sufficient, under the decisions of this court in *State v. Leicham,* 41 Wis. 565, and *Campbell v. State,* 111 Wis. 152, 86 N. W. 855.

4. The defendant requested the giving of the following instruction, which was refused:

"I charge you, gentlemen, that it is a prominent fact in this case that the deceased is the wife of the defendant. The

presumption that has arisen that she was not killed by her husband or that it was not malice aforethought is powerful. The relation of the husband and wife clearly implies a strong partiality on the part of the husband towards his wife and the most ardent desire to protect her and render her happy. As a man will conserve his own preservation and pursue his own interests, so, as a general truth, he will equally regard the protection and interest of his wife."

This was properly refused. While the sentences requested were quoted approvingly by this court from a Connecticut case, in *Boyle v. State,* 61 Wis. 440, 21 N. W. 289, they were simply used as an argument upon the question of admission of certain evidence, not as an appropriate charge to a jury. It would clearly not have been proper under the testimony in the present case to have given the jury any such broad and sweeping generalizations as to the presumptions resulting from the marital relation.

5. The defendant's counsel made the following request for an instruction to the jury:

"The defendant requests that the court instruct the jury upon the law and definition of manslaughter in the second degree, as stated in sec. 4350 of the Statutes of the State of Wisconsin, and instruct the jury that if they find from the evidence that manslaughter in the second degree is proven they can find the defendant guilty of such charge."

A similar charge was.requested as to the fourth degree of manslaughter, under sec. 4362, Stats. 1898. Both of these requests were refused, and exceptions were duly taken, and these rulings are now assigned as error. The effect of the general charge of the court was that the defendant must either be convicted of murder in the first degree or acquitted. The instructions requested were inartificially drawn and cannot be commended. A requested instruction should be so drawn that it can be given in the words of the request without change. Stats. 1898, sec. 2853. In prosecutions for serious crimes, however, this court has held that requested instruc-

·tions which express a correct principle should not be refused on account of a mere verbal inaccuracy, but that the trial court should correct the inaccuracy and give the instruction. .*State v. Wilner,* 40 Wis. 304; *Conners v. State,* 47 Wis. 523, 2 N. W. 1143. In substance, the defendant requested the court in writing to read to the jury the sections of the statute named, and instruct them that if the facts warranted they could find the defendant guilty of either of such offenses. So ·we think we must meet the question whether there was evi·dence in the case which would require the court, if requested, to submit the question of manslaughter in the second degree, ·or manslaughter in the fourth degree, or both, to the jury.

Manslaughter in the second degree is thus defined by sec. 4350:

"The killing of a human being, without design to effect ·death, in a heat of passion, but in a cruel and unusual manner, unless it be committed under such circumstances as to constitute excusable or justifiable homicide, shall be deemed manslaughter in the second degree."

Manslaughter in the fourth degree is thus defined by sec. 4362:.

"The involuntary killing of another by any weapon or by ·any means, neither cruel nor unusual, in the heat of passion, in any cases other than such as are herein declared to be justi-fiable or excusable homicides, shall be deemed manslaughter in the fourth degree."

It will be noticed that in both of these offenses the killing ·must be done in the heat of passion, and we are first met by ·the proposition on the part of the state that, because the defendant testified positively that he was not angry at any time during the ride home, he is concluded upon the subject, and was not entitled to ask for an instruction that he might be found guilty of any crime involving as a necessary element ·the heat of passion. On this point reliance is placed upon ·the decision in the case of *Perugi v. State,* 104 Wis. 230, 235, ·80 N. W. 593, and it must be said, in justice to the trial

court, that the ruling is fully sustained by the decision upon the exact point which was made in that case. It was suggested also that a like ruling was sustained in *Fertig v. State,* 100 Wis. 301, 75 N. W. 960, but reference to that case shows that, in passing upon the propriety of a proposed instruction involving self-defense, the fact that defendant had testified and maintained that his act was accidental was mentioned, but was simply relied on as a part of the proof which, in connection with other evidence, demonstrated that there was no ground on which a finding of self-defense could be based. However, the ruling was unmistakable in the *Perugi Case,* although no authorities were cited in its support nor have we been able to find any. Upon mature consideration we are satisfied that the ruling cannot be justified. It is well established that while a party in either a civil or criminal case may not directly impeach his own witness, he may show that his testimony is not correct by other witnesses, who testify to a different state of facts. *Richards v. State,* 82 Wis. 172, 51 N. W. 652; *Collins v. Hoehle,* 99 Wis. 639, 75 N. W. 416. It has also been held in Massachusetts that there is no sound reason why this rule should not, if the circumstances are consistent with honesty and good faith, be applied when the party himself is the witness, nor why, under the same circumstances, he may not rely on the testimony of the witnesses of the adverse party to prove material facts denied by his own testimony. *Hill v. West End St. R. Co.* 158 Mass. 458, 33 N. E. 582. Thus, in the present case, suppose there had been a third person in the buggy, who testified to facts showing that the defendant was in anger, and in the course of a struggle with his wife she fell or was thrown from the buggy and received her injuries, could not the defendant have relied on this testimony and insisted upon its submission to the jury, whether the witness were called by himself or by the state, and notwithstanding the fact that he had testified that he was not angry? His testimony that he was not angry is not nec-

essarily dishonest, although it may not be true. He had testified to facts well calculated to excite passion on his part, and we all know how prone people are to honestly misjudge their own feelings, to affirm in good faith that they are not excited or angry, when it is apparent to others that they are. There was direct testimony on the part of the state showing a high state of anger on the part of the defendant upon this remarkable ride; if the jury had found the defendant guilty of a degree of homicide necessarily involving heat of passion, could the defendant have demanded and obtained a new trial because he himself had denied anger? These considerations seem to us conclusive to the effect that the ruling in the *Perugi Case* was wrong and must be overruled, and that, as a result thereof, the defendant was entitled in the present case to have the question of his guilt of either the second or fourth degree of manslaughter submitted to the jury.

6. We reach now the contention that the evidence adduced did not justify a verdict of premeditated murder. We have given this subject careful and earnest consideration. The circumstances under which this woman met her death were of a most remarkable character. She and her husband left Warrens for home near the close of an apparently happy day, in reasonably good health and spirits. There was no indication of any impending disaster or threatened violence. They were in an open buggy, in broad daylight, driving over a familiar road, lined with the homes of friends and neighbors who knew them well, returning home after a separation of weeks or months. Before they had gone two miles the wife had been out of the buggy, her hair was disheveled and streaming down her back, her face covered with blood. From this point the defendant whipped his horses and drove at great speed for most of the way, and the woman was apparently leaning against her husband. She was out of the buggy again when near the end of the journey, and when she reached the end she was either dead or dying from dislocation

of the first and second vertebræ of the neck, her face and head terribly bruised and cut, and her body bearing the marks of her terrible experiences. The defendant telephoned at once for a doctor, over a line which ran through the houses of all his neighbors, and also called some of the neighbors by telephone. The injury was one which produces instant paralysis or death, or both, almost invariably. It generally results from a fall on the head, but may be produced by a sufficient blow upon the neck. There was no testimony of any threat, save the somewhat remarkable testimony of the Bardens to the effect that the defendant, at about three miles from Warrens, struck her on the side or shoulder and said, "Sit up, God damn you, or I'll kill you." It cannot be supposed for a moment that these blows resulted in the fracture of the vertebræ, for the position in which the parties were sitting—i. e. side by side in the buggy—renders it hardly possible that a blow upon the neck sufficient for such a result could be delivered. If the defendant killed his wife by design he certainly chose a most unlikely means, a most unlikely time and place, and followed his act with most remarkable conduct. He was not an educated man. He could not have known that a blow on the neck would be likely to cause such results, nor that a fall from the buggy would be likely to produce them. Not knowing that such results would be probable, is it reasonable to conclude that he adopted either of these means from premeditated design to murder? Can it be reasonably supposed that a man who intended to murder his wife would throw her from the buggy on the chance that she might fall on her head and break her neck, and then gather her into the buggy and run his horses home in view of all his neighbors, and call in a doctor and his neighbors to view his work? We confess that we have been much troubled in attempting to solve these questions, but we have been forced to the conclusion that, culpable as the conduct of the defendant toward his wife may have been, the evidence adduced does not justify

the jury in finding, beyond a reasonable doubt, that murder was in his heart. In our judgment, justice has miscarried here, and there must be a new trial upon this ground as well as for the errors before noted.

*By the Court.*—Judgment reversed, and action remanded for a new trial. The warden of the state prison is directed to deliver the plaintiff in error into the custody of the sheriff of Monroe county, to be by him held to abide the further order and judgment of the court.

CASSODAY, C. J., took no part.

---

THE STATE vs. MURPHY.

*March 28—April 17, 1906.*

*Immunity from prosecution: Person testifying before grand jury: Extent: Privilege of witness: Separate trial on issue of immunity: Questions certified to supreme court: Form.*

1. Under sec. 4078, Stats. 1898, as amended by ch. 85, Laws of 1901 (providing that in certain proceedings no person shall be excused from testifying on the ground that his testimony may expose him to prosecution for any crime, etc., but that no person shall be prosecuted "for or on account of any transaction, matter, or thing concerning which he may testify"), the immunity from prosecution is not broader than the constitutional privilege of the witness (Const., art. I, sec. 8) as to self-crimination.
2. One who was subpœnaed, sworn, and examined before the grand jury, answering only the questions asked, but making no objection to them, is entitled to such immunity as the statute confers, as to transactions concerning which he so testified.

WINSLOW, J., dissents, being of the opinion that, in order to gain the immunity, the witness must be *compelled* to testify, and that compelling a person to appear by subpœna cannot properly be considered as compelling him to testify.

MARSHALL and KERWIN, JJ., are of the opinion that the immunity is given only where the witness testifies under real com-

pulsion, not mere right of compulsion; that is, there must be coercion to the extent of the witness being called to testify under such circumstances that he would be liable to punishment as standing in defiance of the court if he refused to do so.

3. It is not necessary, in order that there may be immunity from prosecution, that the witness should have given evidence adverse to himself, or that he should have told the truth.

4. An alderman, giving evidence before the grand jury, answered in the negative the question whether he had received any money for his vote on special privileges, bay windows, sidetracks, etc. *Held*, that he did not thereby testify concerning the transaction, matter, or thing for or on account of which he was afterwards prosecuted upon an information charging that he had solicited and received a certain sum to induce him to vote in favor of an ordinance allowing certain persons to lay a sidetrack across certain streets.

5. The question whether a special plea of immunity should be tried separately or in conjunction with the plea of not guilty was not a proper one, in that abstract form, to be certified to the supreme court under sec. 4721, Stats. 1898, but is treated as being in effect a question whether error was committed in the particular case by such separate trial.

6. Where defendant requested a separate trial of the issue on the plea of immunity, and the information fully set out the matter on account of which he was attempted to be prosecuted, such separate trial was not error.

REPORTED from the circuit court for Milwaukee county: ORREN T. WILLIAMS, Circuit Judge.

On February 1, 1904, an information was filed against the defendant charging that on the 17th day of June, 1899, he, then being an alderman of the city of Milwaukee, Wisconsin, solicited and received from Oscar F. Davis $80 for the purpose of inducing accused to vote in favor of a then pending ordinance allowing said Davis's firm to lay a sidetrack across certain streets in said city of Milwaukee. After reversal of the first conviction (124 Wis. 635, 102 N. W. 1087) the action was again brought to trial, the defendant having interposed both a plea of not guilty and a plea in bar for that, before a grand jury sitting on the 9th day of January, 1902,

charged with the duty of investigating such offenses, defendant attended and gave testimony as to the transactions, matters, and things alleged in the information, by reason whereof the defendant claimed he could not be prosecuted or subjected to any penalty or forfeiture therefor. The case being reached for trial, defendant's attorneys called attention to the plea in bar, and stated that was the first thing to be heard and tried, to be followed, if necessary, by the plea of not guilty, to which the court responded, "that will be the order of procedure." Accordingly, jury being impaneled, trial on the special plea proceeded, where was proved the instructions to the grand jury to consider all malfeasance in office on the part of city and county officers with a reference to the statutes against bribery; also offer of proof that defendant was subpœnaed to attend on the 9th day of January, 1902, and did so. They then called the clerk of the grand jury and produced his minutes, showing that defendant was produced as a witness, sworn, and was asked and answered questions. The minutes of testimony read thus: "Ald. *Wm. Murphy,* alderman Third ward, serving second term, sworn: Know Fred Schultz, J. M. Clarke, Mr. Walker. Know of no alderman or public official demanding or receiving money to support any contract, special privilege, or franchise. Never had conversation with Schultz, or any other newspaper man, about special privilege for electric signs." Witness stated: "That does not purport to give the questions asked *Mr. Murphy;* only a synopsis of the answers."

Thereupon defendant testified that he was subpœnaed, sworn, and examined by the district attorney, and was asked "if I received any money for my vote on special privileges, bay windows, sidetracks, electric light, street railway extensions, I, or any of the aldermen or city officials," and that he answered such questions. Also that the district attorney "asked me if I got any money for sidetrack privileges or if I knew any alderman or any city official that had received

money for their influence, their vote—I answered him." "I answered these questions under oath . . . I answered fully all questions asked me while a witness before the grand jury." The ordinance granting Davis Bros. a right to lay a sidetrack was introduced and passed before the examination before the grand jury.    On cross-examination he stated that he had no recollection of being cautioned that he need not give evidence which, in his opinion, would criminate him, but he could not swear positively; that he gave his testimony voluntarily and offered no objections to the questions asked him, and that the minutes kept by Mr. Moravitz are not a full report of the testimony he gave; that he did not volunteer any evidence, only answered what he was asked, and gave his testimony be-cause he was subpoenaed to go before them and was asked questions by the prosecuting attorney, but freely and voluntarily.

Mr. Goff, assistant district attorney, stated that the witnesses (before the grand jury) were instructed that they need not incriminate themselves; also that the attention of the district attorney had not been called to ch. 85, Laws of 1901.

Thereupon, on motion of the district attorney, the court directed the jury to find a verdict in favor of the state, which they accordingly did, and to which action defendant duly excepted.    Then the trial upon the plea of not guilty proceeded and defendant was convicted of the charge set forth in the information.    Thereupon the court, deeming that certain questions were doubtful and important, certified the following for answer, viz.:

"(1) Was the evidence, all of which is herewith certified, sufficient to immune the defendant under the provisions of sec. 4078, Stats. 1898, as amended by ch. 85, Laws of 1901 ?[1]

---

[1] Sec. 4078, Stats. 1898, as amended by ch. 85, Laws of 1901, is as follows:

"No witness or party in an action brought upon the bond of a public officer, or in an action by the state or any municipality to recover public money received by or deposited with the defendant, or in any action, proceeding or examination, instituted by or in behalf of the

"(2) Did the court err in directing a verdict against the defendant and in favor of the state on the special plea in bar herein, under the evidence?

"(3) Should the plea of immunity be tried separately, or in conjunction with the plea of not guilty?"

For the plaintiff there was a brief by the *Attorney General* and *A. C. Titus,* assistant attorney general, and by *Francis E. McGovern,* district attorney, and *Guy D. Goff,* assistant district attorney, of counsel, and oral argument by *Mr. McGovern.*

*J. M. Clarke,* for the defendant.

DODGE, J.   In presenting the first question certified, counsel have discussed many general considerations bearing upon the purpose and scope of this immunity statute which, in its exact form and words, originated with Congress in Act February 11, 1893, ch. 83, 27 Stats. at Large, 443 [3 U. S. Comp. Stats. 1901, p. 3173]. The counsel for the state insists that its only purpose is to enable the obtaining of evidence which by the fourth and fifth amendments to the constitution of the United States a witness is privileged to withhold but for such a statute, hence that it must be construed as intending to grant immunity only broad enough to accomplish that result; only such as must be granted in order to evade the constitutional privilege of silence as to self-criminatory facts.   But must we assume that the statutory immunity is no broader than the constitutional privilege of a witness to withhold evidence which may be used against him in a criminal case?   The legislature, of course, might refrain from invading private liberty up to the full limit that the constitution permits, just

as individuals may, and some do, refrain from disturbing their neighbors' comfort up to the full limit permitted by law.    If the words of the act in question, reasonably considered, do fairly promise a broader immunity than could have been secured had the constitutional privilege of silence been exercised, why should they not be given effect.    No court can presume that the legislature acted in bad faith or with intent to mislead or deceive.    *Great Falls Mfg. Co. v. Att'y Gen.* 124 U. S. 581, 599, 8 Sup. Ct. 631.    Hence any promise such as this is to be at least fairly construed in favor of one who in consideration thereof is deprived of a valuable right. Is there anything in the history of this legislation so' clearly limiting the legislative intent that it should control the words used to express it?