TERRILL, Plaintiff in error, vs. THE STATE, Defendant in error.

*March 21 — April 25, 1889.*

CRIMINAL LAW. *(1) Murder in third degree. (2) Insanity: Drunkenness: Instructions to jury.*

1. On a trial for murder the evidence showed that the fatal shot was either fired at a stove and glanced therefrom hitting the deceased, or was fired directly at him, and there was no evidence that the

Terrill vs. The State.

accused intended to hit him in any place other than he did, so as to warrant a finding that his intent was to do great bodily harm but not to effect death. The accused was not, at the time, engaged in the commission of any other felony. *Held*, that a conviction of murder in the third degree (sec. 4345, R. S.) was not warranted.

2. On a trial for murder, there being evidence of drunkenness and insanity, and of an injury to the defendant's head in childhood, it was error to charge the jury, in effect, upon the special issue of insanity, that although they should find that at the time of the killing the normal exercise of brain function by the defendant was totally suspended, or that his mind was diseased to such a degree of madness as would otherwise relieve him from responsibility, or that he was actually insane, yet if such mental condition was directly or even remotely caused by voluntarily drinking intoxicating liquors, or even if such insanity was produced by other causes combined with such voluntary drinking, still they must find that the defendant was responsible for his conduct, and therefore sane.

ERROR to the Circuit Court for *Iowa* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

The information against the plaintiff in error charged, in effect, that May 12, 1888, at the city of Mineral Point in Iowa county, the said *Mark Terrill* did wilfully, feloniously, and of his malice aforethought, kill and murder Henry Wesley, against the peace and dignity of the state of Wisconsin. The said *Terrill* pleaded not guilty to said information, and he also put in a special plea to the effect that at the time and place mentioned he was insane and in no way responsible for any act that he did as connected with the alleged homicide; that said insanity was temporary, but real and absolute; and that he (the said *Terrill*) ought therefore to be discharged hence free from blame or fault. Thereupon the district attorney replied to said special plea of insanity, denying said insanity and each and every allegation charging such insanity. Upon the separate trial of said issue of insanity the jury returned the following verdict, to wit: "We, the jury, have no reasonable doubt that at the

time the defendant is alleged to have committed the offense set forth in the information he was sane." At the close of the trial upon the charge of murder, the jury returned the following verdict, to wit: " We, the jury, find the defendant guilty of murder in the *third* degree." Thereupon the sentence of the court was pronounced as follows: "The sentence of the court is that the defendant, *Mark Terrill*, be punished by imprisonment ih the state prison at Waupun for the period of seven years. All of that time, with the exception of one day, to be at hard labor, and one day to be passed in solitary confinement." To review such judgment of the court the said *Terrill* has sued out this writ of error.

For the plaintiff in error there was a brief by *Spensley & McIlhon*, and oral argument by *Calvert Spensley*. They argued, among other things, that if the accused was actually insane at the time of the homicide, and such insanity was produced by some other cause operating together with drunkenness, then he was not criminally responsible. In addition to cases referred to in the opinion, they cited *Smith v. Comm.* 1 Duv. 224; *State v. Dillahunt*, 3 Harr. 551; *Stewart v. State*, 1 Baxt. 180; *Curtis v. State*, 12 Tex. 500. The court also erred in charging the jury that the only offenses of which defendant could be found guilty were murder in the first, second, or third degrees, or manslaughter in the fourth degree. If there was any evidence which would have justified the jury in convicting the defendant of any other offense than those named, this was error. *Boyle v. State*, 57 Wis. 484; *Bennett v. State*, id. 69; *Conners v. State*, 47 id. 523; *Knoll v. State*, 55 id. 249; *Holder v. State*, 5 Ga. 441; Whart. Cr. Law, sec. 41.

For the defendant in error there was a brief by the *Attorney General* and *L. K. Luse*, Assistant Attorney General, and oral argument by the *Attorney General*. They contended, *inter alia*, that voluntary intoxication is no excuse

Terrill vs. The State.

for crime. · *State v. Schingen*, 20 Wis. 74; *Cross v. State*, 55 id. 261; *Flannigan v. People*, 86 N. Y. 554; 1 Whart. Med. Juris. sec. 207. Insanity which is the immediate result of drunkenness does not relieve the person from responsibility. *Schlencker v. State*, 9 Neb. 241; *State v. Hundley*, 46 Mo. 414. Though if the drunkenness *has passed away* and has caused disease of the mind amounting to insanity, the law looks only to the proximate and not to remote causes. *U. S. v. Drew*, 5 Mason, 28; *Fisher v. State*, 64 Ind. 435. The circuit court gave the correct rule as to what constitutes insanity within the meaning of the statute. *Bennett v. State*, 57 Wis. 69; *Anderson v. State*, 25 Neb. 550; *M'Naughten's Case*, 10 Clark & F. 200; *Territory v. Catton*, 16 Pac. Rep. (Utah), 902; *U. S. v. Young*, 25 Fed. Rep. 710; *U. S. v. Ridgeway*, 31 id. 144; *Guiteau's Case*, 10 id. 161; *State v. Reidell*, 14 Atl. Rep. (Del.), 550, note; *Rather v. State*, 25 Tex. App. 623.

CASSODAY, J. The facts and circumstances attending the homicide, as stated by the respective counsel, seem to be substantially as follows: *Terrill* was born and raised in Mineral Point. At the time of the homicide he was the proprietor and keeper of a hotel at that place, with a bar-room in the basement. When he was a young man he was in the habit of drinking intoxicating liquors. Then he quit, and for seventeen years refrained entirely from drinking any such liquors. About 1885 he commenced drinking again, and continued for a few days. After that he drank occasionally, but at long intervals. A few days previous to the killing he had sat up for several nights with a sick son. On the afternoon of Saturday, May 12, 1888, he drank a patent medicine which was intoxicating. In the evening he drank heavily of intoxicating liquor at a saloon. About 11 o'clock in the evening of that day he returned to his own hotel, accompanied by some other persons. Soon

after, in his bar-room, he invited the deceased and two or
three others present to drink, and they all, in a friendly
way, including *Terrill*, drank two or three times together.
During the time the deceased took from his pocket a re-
volver, and said, in effect, that if any one attempted to touch
*Terrill*, he (the deceased) would put a hole through him with
his revolver. *Terrill* then told the deceased to put up the
revolver; that there was no need of trouble; and the de-
ceased did so. *Terrill*, apparently pleased with the deceased,
offered him some money, which he at first hesitated to
take, but finally consented to take one dollar. As *Terrill*
was in the act of handing the deceased the dollar, he drew it
back, saying — "Pshaw! a dollar aint anything;" and then
handed him a five-dollar bill. *Terrill* then treated them
all, and the deceased insisted upon paying for the drinks,
and handed the five-dollar bill to *Terrill* for that purpose.
*Terrill* took the money, and then went up the steps on the
west side of the bar-room into the dining-room, apparently for
the purpose of getting the bill changed, but soon returned
by the same steps to the bar-room below with a .44-caliber
British bull-dog self-cocking revolver in his hand, and, hold-
ing the revolver up, he walked towards the bar, near the
east end of which the deceased stood — on the south side of
the room. The deceased exclaimed: "Don't shoot, Mark!
Put that up." After a step or two forward, *Terrill*, with-
out saying a word, walked or retreated back towards the
north side of the room, and near the large stove standing
near the center of the room, and on the north side of it,
and probably a few steps west of it. From that place, or
in that vicinity, *Terrill* fired at least three times, possibly
four, as it was found that four of the chambers of the re-
volver were empty, although the witnesses seem to agree
that there were only three shots. After the first shot the
deceased appears to have moved from the east corner of
the bar, on the south side of the room, towards the north

side of the room, and when the second and third shots were fired he was directly east of *Terrill*, and about five or six feet from him, and a little north and east of the stove — in the act of moving or dodging. The testimony does not indicate very clearly the positions of the several persons in the room during the time. All seem to agree that the last shot fired was the one that killed Wesley, the ball penetrating his head at the inner angle of the right eye, a little below where the eye-brow joins the nose, and passing in nearly a straight line to the body of the sphenoid bone, a portion of which was destroyed. It did not touch the brain, and he died from hemorrhage caused by the rupture of arteries. It was the opinion of the four medical experts that it was a glance shot, as a direct shot would either have passed clear through the head, or nearly so. *Terrill* did not speak a word after coming down stairs with the revolver until after the shooting, and then went up to the deceased and said: "By God," or "My God! I have shot him." *Terrill* and Wesley had always been good friends, and there was not an angry word spoken by either of them, nor by any one there that night. One shot lodged in the bird-cage at the extreme south end of the room, and above the bar; one grazed the ceiling a few feet southeast of the stove; another grazed the girder extending from a post standing near the southeast corner of the stove, towards the bar; and one passed through the upper part of the window on the east side of the room. Some of the shots grazed the stove. The direction of the first shot is somewhat uncertain, but it seems to be conceded that it was not in the direction of the deceased. It is undisputed that at the time of firing the second and third shots *Terrill* stood on the north side of the stove, and a little to the west of it, and facing the stove, or, as the witnesses said, "quartering" to it, and fired in the direction of the stove.

Upon the trial the court submitted to the jury the ques-

tion whether *Terrill* was guilty of murder in the first, second, or third degree, or manslaughter in the fourth degree. There may have been sufficient evidence to have supported a verdict of murder in the first or second degree, or of manslaughter in the fourth degree, and perhaps some other degree of homicide. In respect to murder in the third degree the court charged the jury as follows: "If the defendant did not kill Wesley from premeditated design or any other design to effect his death, nor by an act imminently dangerous to others and evincing a depraved mind regardless of human life, but you are convinced from the evidence, beyond a reasonable doubt, that at the time the defendant shot Wesley he intended to do the latter great bodily harm, and that it was pursuant to such intent that the defendant fired the fatal shot, you should find the defendant guilty of murder in the third degree, which is punishable by imprisonment in the state prison not more than fourteen years, nor less than seven years." The jury returned a verdict to the effect that *Terrill* was guilty of murder in the third degree. Such an offense is described by the statute in these words: "The killing of a human being without any design to effect death, by a person engaged in the commission of any felony, shall be murder in the third degree." Sec. 4345, R. S. The term "felony," here used, means an offense punishable "by imprisonment in the state prison." Sec. 4637, R. S.; *State v. Hammond,* 35 Wis. 318. The felony here mentioned is manifestly a different offense from the killing of which the accused is convicted. To sustain the conviction, therefore, there must be evidence in the record that at the time of the killing *Terrill* was actually "engaged in the commission" of some other offense punishable by imprisonment in the state prison, and also that while so engaged he fired the shot which resulted in the death of Wesley, but that such shooting was without any design to effect the death of any

human being. In other words, the evidence must justify what the jury have, under the portion of the charge quoted, in effect found, to wit, that *Terrill* purposely shot at Wesley with the intent to do him great bodily harm, but without any design to effect his death. Sec. 4377, R. S. As indicated, the evidence seems to be conclusive that the fatal shot was aimed at the stove and not directly at Wesley; but assuming that *Terrill* intentionally shot at Wesley with the design of hitting him, then there seems to be no evidence in the record that he intended to hit him in any place other than he did, and if he intended to hit him where he did, or in the body, then, manifestly, he should have been convicted of murder in the first degree; but that does not justify a conviction for murder in the third degree. If, on the other hand, *Terrill* intentionally aimed at the stove, and the ball accidentally glanced and hit Wesley, then it is not true that he shot with the intent to do the deceased great bodily harm, for in that event he could have had no intent to hit him in any particular part of his person. In any view of the case, the verdict seems to be unsupported by the evidence. These views are in harmony not only with the case cited, but also with *Pliemling v. State*, 46 Wis. 516; *Boyle v. State*, 57 Wis. 472.

2. The statute prescribes, in effect, that upon the trial of such special issue of insanity, if the jury shall find that the accused person was insane, " or that there is reasonable doubt of his sanity at the time of the commission of such alleged offense, they shall also find him not guilty of such offense for that reason." Sec. 4697, R. S.; ch. 164, Laws of 1883. Upon the trial of that issue, the court, among other things, charged the jury as follows: " What is insanity, as known to law? When does the law deem a person unaccountable by reason of insanity for doing an act that would be a crime if done by a man of sound mind? I answer that insanity, as known to the law, is a disease of the mind. To render

a man unaccountable by reason of insanity for doing that which otherwise would be a crime, he must, at the time he did the act, have been laboring under such a defect of reason from disease of the mind, not voluntarily assumed, as not to know the nature or quality of the act he was doing, or, if he did know it, that he was not aware that what he was doing was wrong. . . . A man is responsible for a condition which he voluntarily brings upon himself. That form of intoxication which results in the total or partial suspension of or interference with the normal exercise of brain function is held at law to be a voluntary madness caused by the wilful act of the drunkard, and if he be a person who, while sober, is sane, this condition does not relieve him from responsibility for the commission of an act which, if committed by a sober man, would be a crime. In other words, the law assumes that he who, while sane, puts himself voluntarily into a condition in which he knows he cannot control his action, must take the consequences of his act." The jury were also, in effect, told that if the accused was in such a condition of mind, by reason of being compelled by others to so drink intoxicating liquors, then he was irresponsible.

The court also refused to give the following instructions to the jury: "If a man, by drunkenness, brings on a state of disease which causes such a degree of madness, even for a time, which would have relieved him from responsibility if it had been caused in any other way, then he is not criminally responsible. . . . If you find, from certain causes proved to have affected the mind of the defendant, combined with the voluntary drinking of intoxicating liquors, he was insane at the time of the shooting, you will find him not guilty, although you may also find that the insane condition would not probably have existed if he had not drunk the intoxicating liquors."

Such portion of the instructions thus given and refused,

and others, as relate to the *mere* intoxication, drunkenness, or stupefaction produced by the drinking of liquors, were not strictly applicable to the special issue of insanity, but by well-recognized authorities they were applicable upon the issue of not guilty, in determining the degree of crime for which the accused might have been found guilty. Thus it is stated on behalf of the supreme court of the United States, in a late case, by Mr. Justice GRAY, that " when a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question whether the accused is in such a condition of mind, by reason of drunkenness or otherwise, as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury." *Hopt v. People*, 104 U. S. 634, and cases there cited. See, also, *Jones v. Comm.* 75 Pa. St. 403; *Smith v. Comm.* 1 Duv. 224; *Schlencker v. State*, 9 Neb. 242. Here the trial court did, to a certain extent, allow the jury to consider such condition of mind in determining the degree of crime for which the accused might have been found guilty. But such rulings of the court upon the special issue of insanity, and the verdict upon that issue, seem to have eliminated from the case, to a certain extent, the question of such condition of mind so produced. But the rulings of the court went further, and, as we understand them, in effect informed the jury that although they should find that at the time of the shooting the normal exercise of brain function by the accused was totally suspended, or his mind diseased to such a degree of madness as would otherwise relieve him from responsibility, or that he was actually insane, yet that if such mental condition was directly or even remotely caused by voluntarily drinking intoxicating liquors, or even such insane condition of mind was produced by other causes combined with such voluntary drinking, still they must find that the accused was responsible for his conduct, and therefore sane.

"Drunkenness is not insanity, nor does it answer to what is termed an 'unsound mind,' unless the derangement which it causes becomes fixed and continued, by the drunkenness being habitual, and thereby rendering the party incapable of distinguishing between right and wrong." *Rennie's Case*, 1 Lew. Cr. Cas. 76. In the recent English case, STE-PHEN, J., uses similar language: "Drunkenness is one thing, and the diseases to which drunkenness leads are different things; and if a man by drunkenness brings on a state of disease which causes such a degree of madness, even for a time, which would have relieved him from responsibility if it had been caused in any other way, then he would not be criminally responsible. In my opinion, in such a case, the man is a madman, and is to be treated as such, although his madness is only temporary. If you think he was so insane that if his insanity had been produced by other causes he would not be responsible for his actions, then the mere fact that it was caused by drunkenness will not prevent it having the effect, which otherwise it would have had, of excusing him from punishment. Drunkenness is no excuse, but *delirium tremens*, caused by drunkenness, may be an excuse if you think it produces such a state of mind as would otherwise relieve him from responsibility." *Reg. v. Davis*, 14 Cox, Crim. Cas. 564. To the same effect are numerous cases in this country. *Bradley v. State*, 31 Ind. 492; *Cluck v. State*, 40 Ind. 263; *Fisher v. State*, 64 Ind. 435; *State v. Garvey*, 11 Minn. 154; *People v. Cummins*, 47 Mich. 334; *Roberts v. People*, 19 Mich. 401; *Beasley v. State*, 50 Ala. 149; *Erwin v. State*, 10 Tex. App. 700; *State v. Hurley*, Houst. Cr. Cas. 28; *Maconnehey v. State*, 5 Ohio St. 77; *Boswell v. Comm.* 20 Grat. 860; *State v. Hundley*, 46 Mo. 414.

There is evidence in the record tending to show that the accused received an injury to his head in childhood. We have assumed that there is evidence in the record tending to prove that at the time of the shooting the mind of the

accused was diseased — that he was in fact insane, as distinguished from mere intoxication or drunkenness. Upon this assumption we are constrained to hold that the rulings of the court upon the special issue of insanity were misleading, and hence erroneous. There are numerous other exceptions in the record, but they are so related to the rulings mentioned that we deem it unnecessary to consider them.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial upon both of the issues. The warden of the state prison will surrender the plaintiff in error to the sheriff of Iowa county, who will hold him in custody until he shall be discharged or his custody changed by due course of law.

See note to this case in 42 N. W. Rep. 244.— REP.