DUTHEY, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 23—March 19, 1907.*

*Criminal law and practice: Homicide: Degrees: "Involuntary killing:" "Heat of passion:" Defendant's declarations, when not conclusive: "Justifiable" and "excusable" homicide: Insanity: Opinion evidence: Form of questions: Instructions to jury: Summarizing contentions of counsel: Information which should not be given: Evidence: Reporter's minutes: Conduct of trial judge.*

1. Refusal by the trial court to submit the question whether defendant was guilty of a lower degree of homicide than that of

which he was convicted was prejudicial error if the evidence, in any reasonable view, could support a conviction of such lower degree.

2. Where the killing was by a pistol discharged by the volition of the defendant, without any element of accident or inadvertence, it was not an "involuntary" killing within the meaning of secs. 4355, 4362, Stats. (1898).

3. The killing of defendant's wife with a pistol, claimed by him to have been done while he was temporarily insane because of her misconduct, is *held* upon the evidence not to have been within sec. 4363, Stats. (1898), covering "every other killing," etc., than those covered by other sections.

4. Upon the evidence (stated in the opinion) it is *held* that the jury might have found that the killing of his wife by defendant with a pistol was in heat of passion and without a design to effect death so as to make the crime manslaughter in the third degree, as defined in sec. 4354, Stats. (1898).

5. A defendant's own declarations, even under oath as a witness, are not conclusive against him if other evidence justifies an inconsistent conclusion as to the fact. Thus, defendant's testimony asserting delirium and unconsciousness of his acts at the time of killing his wife did not preclude the jury from finding from other evidence that there was merely that blind anger which the law calls heat of passion.

6. A killing not involving any element of self-defense or enforcement of a duty cannot be a justifiable homicide under sec. 4366, Stats. (1898).

7. A killing by the use of a dangerous weapon cannot be an excusable homicide under sec. 4367, Stats. (1898).

8. When a nonexpert witness is to be asked his opinion as to a person's sanity the question should be, substantially: What impression was made upon your mind by the conduct, actions, manner, expressions, and conversation which you observed?

9. A physician was asked whether, assuming the truth of certain facts stated and of the testimony of the defendant which he heard, he saw in those facts and that testimony any indication that defendant was suffering at any time from melancholia. *Held*, that the question was proper and that answers thereto by the witness, "I see no signs of melancholia," and "There is no evidence of melancholia in that testimony," were not objectionable in form.

10. Although upon the trial of the issue as to insanity of the defendant the presumption is in favor of sanity, the jury should not be instructed that this throws upon him the burden of proof and that to escape he must produce evidence of insanity suffi-

cient to raise a reasonable doubt. The proper instruction is simply that if, after considering all the evidence before them, there remains in the minds of the jury any reasonable doubt of sanity, they should find the defendant insane.

11. If, in charging the jury, the court attempts to summarize and declare the contentions made by either party he should do it with great care and only after being assured that he appreciates not only what those contentions are but their relative importance as viewed by counsel.

12. To be a ground of reversal, an omission from such a statement by the court should have been called to the attention of the trial court by a request that the thing omitted be supplied.

13. However sane one may have been at all other times, if he was actually insane within the legal definitions at the time he committed the criminal act he is not responsible. It was error, therefore, to instruct the jury, in effect, that if defendant while sane determined upon the killing of the deceased he must be found sane although thereafter he became insane and was so at the time of the homicide.

14. One cannot be held criminally responsible for acts done while he was actually insane, even though his mental state was brought about by his own fault in yielding to anger or passion.

15. It was improper for the trial court, in reply to a question asked by the jury while they were deliberating upon the issue of sanity, to inform them that if they found the defendant sane the same jury would afterwards pass upon the question of his guilt or innocence. The court should have told them that such information had no relevancy to their duty in respect to the issue before them.

16. It is the duty of the trial court, especially when so requested, to instruct the jury specifically as to their duty to acquit if they entertain a reasonable doubt as to the guilt of the defendant.

17. Upon the trial of the issue of guilty, permitting the court reporter to read his minutes of the testimony given by defendant on the trial of the issue of sanity was not error merely because there was no other reporter to take down the oral testimony so read to the jury.

18. Conduct of the trial judge is criticised, in that he took occasion, when the jury had returned into court during their deliberations, to explain his course and vindicate his acts and motives, with reference, particularly, to a complaint of defendant's counsel, in his argument, that the lower degrees of homicide had not been submitted to the jury. The minds of the jury should not have been diverted from their duty by any discussion as to propriety of conduct of court or counsel.

APPEAL from a judgment of the superior court of Douglas county: CHARLES SMITH, Judge.    *Reversed.*

Writ of error to review a conviction for murder in the second degree, for that the plaintiff in error, hereafter called the defendant, murdered his wife, on the 3d day of September, 1905, by shooting her.   The proof of specific facts was almost without dispute.   The defendant, thirty-eight years of age, a laborer, had been married about eight years to the deceased, who had two children, a girl and a boy, four and eight years of age, respectively.   He was domestic and industrious in habit and had accumulated some considerable property.   He became suspicious of the relations of his wife with one Langreet and one Blyenberg.   At his wife's persuasion he gave her $500, whereupon she took the daughter, eight years old, and disappeared.   He later discovered that she was in Seattle living with Langreet.   He went there to break up the relations, but was met by his wife with conciliatory proposals and they returned to Superior.   She, however, refused to live with him, but occupied a separate house belonging to her brother. He became persuaded that she had deceived him in order to screen Langreet at Seattle.   On the night preceding the killing he learned that Langreet had returned and that he and defendant's wife intended to marry.   According to his testimony, this situation created such a condition of mental and nervous disturbance as to entirely unbalance him.   He describes the situation as well as he can, in broken English, he being a Belgian: On the next day he sees Blyenberg and Langreet together and imagines that they are making him subject of ridicule, and later sees Langreet with his wife and conceives similar conduct on their part, some time about 5 o'clock p. m. on the day of the shooting.   From that time he describes himself as wholly unable to remember his acts, although he recalls certain isolated facts.   Between 7 and 8 o'clock he went to the saloon of Blyenberg, where Langreet was likely to be, went up to the bar and shot Blyenberg, and it is supposed would

have shot Langreet, but the latter made his escape through the back door. Thereafter he went seven or eight blocks to the house where several persons, including his wife, were sitting, pushed open the door, thrust his right hand with the revolver through it, and shot, the bullet striking his wife so that she died before morning. He professes to have had no knowledge of shooting her, and was greatly distressed when so informed the next day. A plea of insanity was introduced, which was tried separately, and a verdict of sanity found, and thereupon, on trial of the issue of guilt or innocence, he was found guilty of murder in the second degree and duly sentenced.

*W. P. Crawford,* for the plaintiff in error.

The cause was submitted for the defendant in error on the brief of the *Attorney General* and *A. C. Titus,* assistant attorney general, and of *W. R. Foley,* of counsel.

Dodge, J. 1. The most radical and conclusive assignment of error, though not the first in order on the brief, is the refusal of the trial court to submit any other degree of homicide than murder in the first and second degrees, although specifically requested in writing to submit third and fourth degrees of manslaughter. If the evidence, in any reasonable view, could support either of these lower degrees, this refusal was error, from which prejudice to the defendant is undeniable. *Perkins v. State,* 78 Wis. 551, 558, 47 N. W. 827; *Terrill v. State,* 95 Wis. 276, 291, 70 N. W. 356; *Murphy v. State,* 108 Wis. 111, 117, 83 N. W. 1112; *Montgomery v. State,* 128 Wis. 183, 197, 107 N. W. 14. Each of these crimes may be committed in different ways, and one phase of each consists in the *involuntary* killing. Secs. 4355, 4362, Stats. (1898). Since the discharge of the pistol, a dangerous and deadly weapon, was clearly by the volition of the accused, so that there was no element of accident or inadvertence therein, this element of involuntary killing, as distinguished from a killing

merely without a design to effect death, could not, in any view of the evidence, have existed in the light of the definition of involuntary killing as recently promulgated in *Johnson v. State,* 129 Wis. 146, 108 N. W. 55, 59. Nor do we think it possible to have been concluded from the evidence that any phase of homicide covered by sec. 4363, Stats. (1898), occurred; that is the omnibus section, for "every other killing of a human being by the act, procurement or culpable negligence of another, where such killing is not justifiable or excusable, or is not declared in this chapter murder or manslaughter of some other degree, shall be deemed manslaughter in the fourth degree." When, however, we turn to sec. 4354, Stats. (1898), we find it to declare:

"Any person who shall kill another in the heat of passion without a design to effect death, by a dangerous weapon, in any case except such wherein the killing of another is herein declared to be justifiable or excusable, shall be deemed guilty of manslaughter in the third degree."

It will be noted that the distinguishing elements here are (1) heat of passion; (2) absence of design to effect death; and (3) by a dangerous weapon. That there was evidence to establish heat of passion, as the phrase is used in the law, the trial court was, evidently, fully convinced; for, throughout the charge on the issue of sanity, he over and over again explained to the jury the duty to refrain from a finding of insanity if the acts were due merely to heat of passion,—instructions which, in themselves, must have been erroneous and prejudicial if there was no evidence of such a state of mind. There can be little doubt, however, but that the jury might have found such a condition to exist. The evidence shows the defendant in a much perturbed and erratic mental condition for some days before the homicide, from the relations between his wife and Langreet, and shows, as expressed in the statement of facts, certain very disturbing events and information on the night before and the day of the killing,

indicating to him that he had been deceived in the apparent partial reconciliation and reformation of his wife, but that a renewal of her relations with Langreet was intended by both. The sight of the man himself on this day, and especially the sight of him and the wife about 5 o'clock in the afternoon, flaunting their intimacy in public, and, as he believed, accompanying it with signs and conduct of ridicule of himself, were all events which might well produce that blind anger which the law calls heat of passion; and, while the defendant in his own testimony asserts rather delirium and unconsciousness of his acts, this statement might have been disbelieved by the jury and the inference of violent passion drawn from the facts that an hour or two later he equipped himself with his revolver, rushing to the saloon where he expected to find Langreet and his companion and abettor, Blyenberg, and there, in the midst of a number of people, shot Blyenberg and pursued Langreet, and after that was seen rushing, apparently blindly, along the sidewalk, so that people had to make way for him, to places where he apparently suspected his wife and Langreet might be, until he reached her brother's house, where, thrusting open the door of a room containing herself, a brother of Langreet, and several other persons, he fired his pistol, without pause, his presence having occupied but a second of time according to the testimony of the witnesses. A defendant's own declarations, even under oath as a witness, are not conclusive against him if other evidence justifies an inconsistent conclusion as to the fact. *Montgomery v. State,* 128 Wis. 183, 107 N. W. 14. There was other evidence which might have been construed by the jury as indicating the confused or even unconscious condition of mind or the blindness of rage and passion, consisting in description of defendant's conduct during the same period of time.

The next characteristic of the crime described by this section is that the killing shall be without a design to effect death. The evidence already recited, the suddenness of the shooting

upon the throwing open of the door into a room where were seated a large number of persons, the remark accompanying that act, "I am not allowed to come in here anyhow," and the showing of confusion, excitement, and nonobservance of things about him, seem to us fully sufficient to have warranted the jury in believing that the shot was fired with no design to kill any particular person, even though the defendant were not in that irrational state which the law recognizes as insanity. These were supplemented by proof of exclamations and apparently unpremeditated utterances made the same evening after arrest and next morning, indicating ignorance of and surprise at the fact of her injury and death.

That the third element, namely, the use of a dangerous weapon, existed, is undisputed. All these things might have existed without there having been either justifiable homicide, as described by sec. 4366, or excusable homicide under sec. 4367, of which we shall have to speak later. We are persuaded, therefore, that defendant was entitled to have the jury pass upon the phase of manslaughter in the third degree defined in sec. 4354, and that refusal of the request for instruction to that effect was error necessitating reversal and new trial.

2. We may say in this connection, for convenience, that we find no phase of the evidence at all consistent with justifiable homicide defined in sec. 4366, each phase of which involves some element of self-defense or enforcement of a duty; nor of excusable homicide under sec. 4367, which is excluded by use of a dangerous weapon, if by no other circumstance. Hence must be overruled assignments of error upon refusal to submit such sections to the jury. Having reached the conclusion that the judgment must be reversed and new trial ordered, we proceed to consider such of the other assignments of error as present questions liable to have any significance upon such trial.

3. The state called the jailer who received defendant into custody, and first proved by him that he had a large experi-

ence as jailer in dealing with insane people, such as were committed to his custody; also that he had a certain limited conversation with the defendant after his arrest a few hours after the shooting, and he was then asked:

"From your knowledge gained from such observation and care of those people and from *Duthey's* actions, conversations, and manner and appearance as you saw him at the jail Saturday night, September 23d, and as you testified here, would you say he was sane or insane? *Answer:* Sane."

Hardly any question of mere practice is so clouded by an indigestible mass of rulings, dicta, and decisions as that of the admissibility of opinions of nonexperts as to sanity. What Mr. Wigmore in his work on Evidence calls the arsenal from which have been drawn all subsequent arguments in favor thereof is the dissenting opinion of Doe, J., in *State v. Pike,* 49 N. H. 399. The confusion on the subject is partially illustrated by an extended note to *Ryder v. State,* 100 Ga. 528, 28 S. E. 246, 38 L. R. A. 721. Practical application of rules with reference to it will be found in *Burnham v. Mitchell,* 34 Wis. 117, 133; *Yanke v. State,* 51 Wis. 464, 8 N. W. 276; *Boorman v. N. W. Mut. R. Asso.* 90 Wis. 144, 62 N. W. 924; *Crawford v. Christian,* 102 Wis. 51, 78 N. W. 406; *In re Guardianship of Welch,* 108 Wis. 387, 84 N. W. 550; *In re Butler's Will,* 110 Wis. 70, 85 N. W. 678; *Hempton v. State,* 111 Wis. 127, 137, 86 N. W. 596; *Lowe v. State,* 118 Wis. 641, 655, 96 N. W. 417; *Schultz v. Culbertson,* 125 Wis. 169, 103 N. W. 234. A little consideration of the reasons why anything more than evidence of the actual physical facts observed by the witness should be allowed to be stated would greatly aid courts and counsel in this field. First, it is obvious that one not an expert can no more aid the jury by an expert opinion as to sanity than any other fact or condition. If all the physical facts can be stated, the jury are as competent to form an opinion as the witness, and their province ought not to be invaded. But all experience teaches the frequent if not

general impossibility of stating all things which the eye and
ear note in an interview with another, the wildness of the eye,
the incoherence of the ideas in speech, hurried or erratic man-
ner, and the like.  Ordinarily it is impossible for the narrator
either to remember the specific acts, words, and gestures or to
adequately describe them so as to convey to his hearer their
significance to the real information desired, namely, the men-
tal state, without stating that they were excited, incoherent,
unreasonable, unusual, or the like, all of which is but state-
ment of conclusion or opinion.  Hence the rule has grown that
the ordinary observer may so state his impression of his inter-
view.  Courts have seemingly been unable to express verbal
distinctions between the mere statement by a witness as to the
impression on his mind of certain acts narrated as fully as he
can and a declaration of opinion generally that the person
was sane or insane, and a direct inquiry as to such opinion is
now sanctioned by the weight of authority, with which the
expressions in our own decisions agree.  The subject received
lucid treatment at the pen of HARLAN, J., in *Conn. Mut. L.
Ins. Co. v. Lathrop,* 111 U. S. 612, 4 Sup. Ct. 533, which
case presents ideal illustration of the best manner of pro-
pounding the proper question to the witness.  After a conver-
sation had been narrated, the manner described as agitated,
face flushed and expressionless, the question was propounded,
substantially, "What impression was made upon your mind by
the conduct, actions, manner, expressions, and conversation
which you observed?"  This was fully approved.  We do not
mean that there would be error in the direct inquiry as to wit-
ness's opinion as to the person's sanity, based, of course, on
what he saw and heard; but the form quoted above is much
more likely to prevent confusion in the mind of the witness
and to impress the jury with the true significance of the testi-
mony.  The question here was inaccurate and improper, in
that it directed the witness to base his opinion as to defend-
ant's general sanity, in part at least, on what he had observed

in others committed to him for incarceration and custody as too dangerously insane to be at large. It also obviously presents an insidious attempt to dignify to the jury the witness's opinion as that of an expert, instead of a mere lay observer, by reason of his frequent contact with insane persons.

4. A physician, who had heard part of defendant's testimony and most of the other testimony on the issue of sanity, and who was informed, by a preliminary hypothetical question, of certain salient portions of defendant's testimony which he had not heard, was asked:

"Now, Doctor, assuming these facts I have stated to be true, and assuming the testimony of the defendant which you heard to be true, do you see in those facts and that testimony any indication that this man was suffering at any time from melancholia?"

This is objected to as calling on the expert to weigh evidence and thereby perform the function of the jury. The answer finally given, after several objections, was to a reiteration of the same inquiry by the court, which did not contain all the restrictive elements of the question above quoted, but referred thereto, so that we think the witness could have understood it only as embodying those restrictions. The question of the manner in which an expert's opinion can properly be taken upon the result of evidence already introduced was examined and discussed in the case of *Cornell v. State,* 104 Wis. 527, 537, 80 N. W. 745, and if, as we hold, the answer was finally given in response to the quoted question, it is apparent at a glance that none of the objections pointed out in that opinion exist. The question was confined to certain facts stated and certain other facts testified to by a single witness, and the expert was directed to answer upon the assumption of the truth of such testimony, so that there was no demand upon him to weigh evidence or to select between conflicting evidence or testimony that upon which he predicated his opinion. We think there was no error in permitting him to answer, nor in

the form of his answer, which was, "I see no signs of melancholia." We think that could have been understood only as expressing his professional opinion. The same construction must be given to another form of answer, "There is no evidence of melancholia in that testimony."

5. Error is assigned upon an instruction on the issue of sanity as follows:

"The jury is instructed that the defendant comes to trial presumed to be sane and not insane. This throws upon him the burden of proof in the first instance. To escape, he must produce evidence of insanity at the time of the homicide sufficient notwithstanding all the evidence to the contrary to raise a reasonable doubt of his insanity as aforesaid."

This method of expression is unfortunate, to say the least of it. While the proposition is no longer debatable in Wisconsin that upon such an issue the presumption is in favor of sanity, and the jury are to so find unless evidence leaves them in reasonable doubt on that subject, yet it is by no means true that the defendant must produce that evidence, nor produce evidence sufficient to raise a reasonable doubt. That doubt may arise just as well from evidence produced by the state or from the very circumstances of the act charged, and the proper instruction on that subject is simply that if, after considering all the evidence before them, there remains in the minds of the jury any reasonable doubt of sanity, their duty is to find the accused insane. Such is the express behest of the statute. Sec. 4697, Stats. (1898). Indeed, the rule of law that there is a presumption of sanity goes little, if any, further than to constitute a rule of practice to the effect that, in the absence of any evidence bearing on the subject, there is no issue to be submitted to the jury. It is a rule important to the courts, but the communication of which to the jury is of doubtful propriety. We do not need to declare whether in every case an instruction such as that now criticised must be held reversible error. There is considerable analogy between the sugges-

tion that the defendant must produce the evidence to overcome the legal presumption of sanity and instructions to the effect that the evidence, or the defendant's evidence, must raise a reasonable doubt, which were criticised in *McAllister v. State,* 112 Wis. 496, 500, 88 N. W. 212, and *Baker v. State,* 120 Wis. 141, 97 N. W. 566, as tending to pervert the mental attitude of the jury from one of needing to be convinced that there is some reason why they should not believe in innocence, to that of needing to be convinced that there is reasonable doubt of guilt.

6. Another portion of the charge which is assigned as error is the following:

"It is contended by the defense that the alienations of the affections of his wife, her debauchment, and the breaking up of his family so affected his nervous system, so overcame and crushed him, that for a space of time covering the homicide reason was dethroned, conscience paralyzed, and the shooting of the deceased an act for which he was not responsible, and the jury is instructed that if such was the fact, or there is reasonable doubt whether or not such was the fact, they will find the defendant insane."

In framing this instruction the court entered a field which is always perilous, namely, that of attempting to state to the jury the contentions of either party. It is in close analogy to attempts to state the evidence which we considered in *Horr v. C. W. Howard Co.* 126 Wis. 160, 165, 105 N. W. 668. When fairly and exhaustively done it may be helpful to the jury, but the view of the court is so liable to differ from that of counsel as to what are the most salient and important elements of the latter's contention that any attempt in this direction is liable to be the subject of criticism as having omitted or subordinated the things upon which he most confidently relies. This attempt is an apt illustration. The circumstances on which appellant lays principal stress as accounting for a state of mind which he claims to have been irrational and insane were those attending the renewal of intimacy and personal

contact between Langreet and his wife, occurring on the very
day of the homicide, while these events narrated by the court
in this instruction were largely preliminary thereto and sig-
nificant merely as preparing appellant's mind to be seriously
affected by the events of that day, so that appellant comes
here with the feeling that those things which he most con-
fidently believes should have led the jury to believe in in-
sanity were in effect withdrawn from their attention, or, if
not withdrawn, at least belittled by the court in this instruc-
tion.    We probably should not consider such an omission a
ground of reversal in absence of any request by the defend-
ant that it be supplied, but if the court attempts to summarize
and declare the contentions made by either party he should
do it with great care and only after being assured that he ap-
preciates not only what those contentions are, but their rela-
tive importance as viewed by the counsel.

Further error is assigned upon the following instruction:

"The court, however, instructs the jury that if following
the conduct of the deceased which the defendant claims to
have been the cause of the homicide, while he still had power
to reason and distinguish right from wrong as to the act in
question, and conscience still protested, he determined upon
the death of the deceased, and the homicide followed as the
fruit of such determination, the homicidal act relates back to
the time of such determination, although the evidence shows
that from that moment until he fired the fatal shot he was in-
capable of rational thought, carried captive to the crime by
the fiend of passion and revenge that he had invited to his
bosom."

This instruction is most obviously erroneous and, in view
of the situation, is prejudicially misleading.   When analyzed
it informs the jury that if one, while sane, determines upon
the killing of another, they must find him sane although there-
after he became insane and was so at the time of the homicide.
There is no limit of time declared which may not elapse be-
tween the reaching of the determination to kill and the time

when he does the act.   In this case there was considerable evidence of a declaration by defendant the night before of a purpose to kill somebody, supposed to include Blyenberg, Langreet, and his wife.   A large share of the events upon which the contention of insanity was predicated occurred after this, so the jury were directed by this instruction that if they believed defendant had reached this purpose the night before, and that he was then not insane, they must find him sane for the purposes of this case, although by after events he became entirely deranged and incapable, as the court phrases it, of rational thought.   Nothing is more certain in the law than that the question of insanity as a defense to crime relates to the moment of the offense.   However insane one may have been at any previous time, that is no defense if not existent at the crucial moment, and, conversely, however sane at all other times, if actually insane within the legal definitions at the time he committed the criminal act, he is not responsible. Such is the question which sec. 4697 requires to be submitted to the jury with the further command that, if such fact be found, defendant be declared not guilty for that reason.

7.  Further error is assigned upon an instruction as follows:

"So, if the defendant's act in shooting his wife was the result of temporary frenzy or passion arising from excitement or anger and not from mental disease or temporary dethronement of reason not brought about by his own fault in yielding to anger or passion, then he is not exempt from criminal responsibility."

The vice complained of in this instruction, which also pervaded several others not specifically assigned as error, is that the jury were thereby informed that mental disease or temporary dethronement of reason would not exempt from criminal responsibility, provided they were brought about by his own fault in yielding to anger or passion.   We cannot escape the view that such an impression was reasonably capable of being conveyed by this charge, whether it was really the idea

in the judge's mind or not. A statement of the proposition seems to leave little necessity for comment or discussion. If a man is insane, if mental disease exists which destroys his capacity to rationally apprehend the significance of his acts or his responsibility therefor, or if, in the language of the court, his reason is dethroned, he is exempt from criminal responsibility, however that condition came about. This subject received consideration in *Terrill v. State,* 74 Wis. 278, 42 N. W. 243, where the trial court instructed that insanity, to be a defense, must not have been voluntarily assumed, as by the use of intoxicating liquors, etc. This was held erroneous on the ground that, if insanity actually existed, its efficacy as a defense could be in no wise impaired by the fact that it had been brought about originally by the voluntary act of accused, citing *Reg. v. Davis,* 14 Cox C. C. 563. In *Hempton v. State,* 111 Wis. 127, 135, 142, 86 N. W. 596, the same principle was discussed with reference to a disturbed mental state sufficient to disable an accused from premeditated design to kill, although not sufficient to constitute insanity, where that condition was brought about by voluntary acts—in that case the use of intoxicating liquor,—and it was again distinctly asserted that the question for the jury was not the means by which the condition was induced, but the existence of the condition, however it arose. In *Johnson v. State,* 129 Wis. 146, 108 N. W. 55, careful explanation was made of the distinction between insanity and that state of frenzy or heat of passion which serves only at best to lower the grade of homicide, but does not exclude criminal responsibility, and of the latter it was there declared:

"It is not inconsistent with intelligent action, with consciousness of what one is doing and of the responsibilities therefor; it is not such as to, temporarily even, dethrone reason, strictly speaking; destroy volition."

Again, it was said to be such as to " 'sway the reason regardless of her admonitions,' but it is not presumed to be, nor

does the heat of passion spoken of contemplate, such overpowering disturbance as to destroy volition, the reasoning faculty, even temporarily." Hence it is obvious that any instruction to a jury that one is held to be responsible for his acts due to mental disease, or to even temporary dethronement of reason, is erroneous, even though that mental state has resulted from his own fault in yielding to anger or passion.

8. While the jury were deliberating upon the issue of sanity they returned in court and asked whether the same jury would have anything further to do with the case if defendant were found sane, to which the court, after some hesitation, gave them an affirmative answer. We cannot approve this course, although we may not feel that prejudice is so apparent that we should deem it ground of reversal in and of itself. The very purpose of sec. 4697, Stats. (1898), is to separate the issue of sanity from the other issues in the case so that the jury may dispassionately view that question, and, having resolved it, if in favor of sanity, may not be embarrassed in their consideration of guilt or innocence by the same questions. The question put by the jury signified at once to the court that at least some of the jurymen were opposed to finding the defendant sane, but that there had been at least some suggestion that this reluctance might be overcome if it was understood that the same jury should have the function of passing upon his guilt or innocence or upon the degree thereof, and the information could have been relevant to no other situation. Instead of aiding such possible compromise of convictions by assuring them that they would continue to try the case, the court should have told them that such information could have no relevancy to their present duty, which was to answer according to their convictions whether the sanity of the accused was established beyond reasonable doubt. Many of the reasons apply to this situation which have induced us to hold, with much persistency, that information to the jury by the court of the effect which answers to specific questions in

a special verdict will have upon the judgment is error warranting reversal. *Ward v. C., M. & St. P. R. Co.* 102 Wis. 215, 222, 78 N. W. 442; *New Home S. M. Co. v. Simon,* 104 Wis. 120, 126, 80 N. W. 71; *Fox v. Martin,* 104 Wis. 581, 587, 80 N. W. 921; *Musbach v. Wis. C. Co.* 108 Wis. 57, 70, 84 N. W. 36.

9. The defendant's counsel, in writing, requested an instruction to the effect that if the jury had reasonable doubt of the guilt of the defendant they should find him not guilty, refusal of which is assigned as error. The charge before us is unique, in that, from beginning to end, there is no express statement to the jury of their duty to acquit if they entertained a reasonable doubt of any of the phases of homicide submitted to them. Doubtless to the legal mind that duty is implied in the very proper general instruction with which the charge was premised, that the presumption of innocence must prevail and defeat conviction unless overcome beyond a reasonable doubt. After definition of reasonable doubt the court instructed that the jury may, if their judgment and conscience so command, find guilt of murder in the first degree, which he then defines in the words of the statute. He proceeds: "Should the jury not find the defendant guilty of murder in the first degree, then in the second degree," which he then defined. He then summarized:

"If, to conclude, the jury find the defendant guilty of murder in the first degree beyond reasonable doubt, they will so return by their verdict. If they do not find him guilty of murder in the first degree and do find him guilty of murder in the second degree beyond reasonable doubt, they will so return."

It is difficult to understand how a judge could have failed to add at this point the correlative duty, in every respect as imperative, to find a verdict of not guilty if they entertain any reasonable doubt of both first and second degree murder. Juries should not be left to infer their duties from mere implication or inference, and, while omission to expressly direct will

usually not be deemed ground of reversal if it may be thought inadvertent and is not called to the attention of the court, we are unable to conceive of any reason that should restrain a trial judge from directing in express words the duty of acquittal under proper circumstances when his attention is' challenged to the subject by request. *Fertig v. State,* 100 Wis. 301, 313, 75 N. W. 960; *Collins v. State,* 115'Wis. 596, 602, 92 N. W. 266.

10. Upon the trial of the issue of guilt the state called to the witness stand the court reporter and asked him to read from his minutes the testimony given by the defendant upon the trial of the issue of sanity. This was objected to on various grounds, but the only one presented as making its admission erroneous is that it was received with no reporter to take the oral testimony so read to the jury. We do not think it erroneous upon this ground. Every purpose of preservation upon the reporter's minutes of that which was conveyed to the ears of the jury was accomplished by his own ability to reduce to shorthand all that passed, except perhaps the reading from a paper, which he could copy at his leisure into his minutes. The bill of exceptions discloses, over the certificate of the judge, exactly what he did read, and we cannot discover that any prejudice could have resulted to the defendant from the irregularity, if it were one. There might have been other grounds why it was improper to allow the testimony to go in, in response to this question. See *Havenor v. State,* 125 Wis. 444, 451, 104 N. W. 116; *Wells v. Chase,* 126 Wis. 202, 105 N. W. 799. But, as none such are argued, and prejudice is certainly very difficult to discover, we do not pass upon them.

11. Since the judgment must be reversed for grounds heretofore stated, we shall not discuss at any length a most unfortunate scene which transpired in presence of the jury at a time when they returned into court in the course of their deliberations upon the issue of guilt or innocence. The court took occasion, upon the text of certain complaint by ·defend-

ant's counsel in his argument to the jury that the lower degrees of homicide had not been submitted to them, to assure the jury of his anxiety to perform his duty fully to the accused, and that, in his best judgment, subject to the liability of all men to err, he had done so, and had shown the utmost favor which his duty permitted, and would, at all stages, care to an extreme limit for defendant's welfare. The jury was charged with the duty of passing on this defendant's guilt or innocence, and their minds should not have been diverted therefrom by a discussion of any question of propriety of conduct of court or counsel. The jury was not intrusted with the function of passing on such question. If the judge felt that his course required explanation or vindication, that was a question between him and counsel or between him and the public. If he looked upon the members of this jury as representatives of the public, he should have postponed his remarks until they had ceased to be charged with the anxious duty of doing justice between this accused man and the state. He might then, certainly without prejudice to the defendant, have constituted them a forum to which to explain himself and vindicate his acts and motives could he have believed they needed any vindication. We need say no more upon this subject, for it is, of course, not liable to recur upon a new trial, nor need we declare whether prejudice therefrom is or is not so obvious as to have effect upon the integrity of the verdict finally reached.

Several other errors are assigned, but we find all of them so lacking in substantial merit, or so immaterial to another trial, that we cannot feel justified to extend this opinion by their discussion. Neither need we call attention to certain colloquies between court and jury, which serve strongly to indicate that the specific errors discussed were probably effective in inducing the jury to conclusions adverse to defendant in fields of evidence where otherwise they might justifiably have found more favorably to him.

*By the Court.*—The judgment is reversed and cause remanded for a new trial. The warden of the state prison is directed to deliver the plaintiff in error, *Edward Duthey,* into the custody of the sheriff of Douglas county, to be by him held to abide the further order and judgment of the court.